**3570 EAST FOOTHILL BLVD., INC., a California corporation, Plaintiff,**

**v.**

**CITY OF PASADENA, a municipal corporation, Defendant.**

No. CV 95–5592 ABC (RMCx).

United States District Court,
C.D. California.

Dec. 20, 1995.

John H. Weston, G. Randall Garrou, Robert A. Sarno, Weston, Sarno, Garrou & DeWitt, Beverly Hills, CA, for plaintiff.

Cristina C. Talley, Acting City Attorney, Benjamin Kaufman, Deborah J. Fox, Freilich, Kaufman, Fox & Sohagi, Los Angeles, for defendant.

### ORDER RE: PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION

COLLINS, District Judge.

Plaintiff's application for a preliminary injunction came on regularly for hearing before this Court on November 17, 1995. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Plaintiff's application for a preliminary injunction is DENIED.

### I. Factual and Procedural Background

The facts of this case are well known to the parties and are recited more completely in the Court's prior Order, dated November 27, 1995, and amended by Minute Order on December 12, 1995.[1] The Plaintiff in this case,

---

1. On December 7, 1995, Plaintiff filed a motion to alter or amend the judgment. As of the date of this Order, this motion is still pending. However, the Court's resolution of Plaintiff's motion will not affect the Court's ruling in this Order.

3570 EAST FOOTHILL BLVD., INC. is a California corporation that owns the "Red Hot Theatre/Cafe," a restaurant/lounge/bar in the Defendant CITY OF PASADENA. Plaintiff corporation has operated the "Red Hot" since May 9, 1995. Currently, Plaintiff's restaurant offers non-adult live entertainment, including, as a result of the Court's prior Order, "bikini dancing."

Plaintiff now seeks to expand the restaurant's business to include "expressive entertainment in the form of theatrical live dance performances by dancers who, for a portion of their dance performance would appear either wearing only what is commonly known as 'pasties' and a 'G-string,' . . . [or] dancing topless but wearing bottoms sufficient to entirely cover their private parts, though not the entirety of their buttocks." Kaltenthlar Decl. ¶ 6. Offering such entertainment would render the "Red Hot" an "adult business" under Pasadena Municipal Code ("P.M.C.") § 17.16.050. Under P.M.C. § 17.16.050, an adult business is one "based upon materials or performances that depict, describe, or relate to 'specified sexual activities,' or 'specified anatomical areas[.]' " Because Plaintiff's proposed live entertainment would involve dancers revealing "specified anatomical areas" (as defined in P.M.C. § 17.12.042), Plaintiff's proposed use would transform the "Red Hot" into an "adult business" under § 17.16.050.

The City asserts that Plaintiff cannot offer adult entertainment because the "Red Hot" is not in the appropriate zone for adult businesses. The City claims that the "Red Hot" is located in an Industrial General ("IG") zone, where adult businesses are not permitted. See P.M.C. §§ 17.28.020 & 17.32.030. Indeed, under the P.M.C., adult businesses are permitted only in Commercial General ("CG") zones. Id. Therefore, if the City is correct in stating that the "Red Hot" is located in an IG zone, Plaintiff is not permitted to offer adult entertainment at the "Red Hot's" current location.

However, Plaintiff disputes that the "Red Hot Theatre/Cabaret" is located in an IG zone. Plaintiff asserts that, as of January 23, 1995, the Pasadena City Council gave effect to an "Interim Specific Plan" which changed the zone in which Plaintiff's restaurant is located to a Commercial General ("CG") zone. As stated, in such a zone, Plaintiff would be allowed to offer adult-type entertainment immediately.[2] In the alternative, even if the "Red Hot" is in an IG zone, Plaintiff asserts that the City's entire adult business zoning scheme is unconstitutional because it does not provide adult businesses with a reasonable opportunity for expression, thus violating the United States Supreme Court's decision in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) and the Ninth Circuit's rulings in *Walnut Properties, Inc. v. City of Whittier,* 861 F.2d 1102 (9th Cir. 1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989) and *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524 (9th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994). Therefore, Plaintiff asserts that the "Red Hot" is entitled to offer adult-type entertainment, regardless of the zone in which the restaurant is located.

On August 21, 1995, Plaintiff filed a Complaint against the City, under 42 U.S.C. § 1983, seeking a declaratory judgment that Pasadena's adult business zoning ordinances, conditional use permit and live entertainment permit ordinances are unconstitutional on their face. In addition to a declaratory judgment, Plaintiff seeks injunctive relief, damages, costs, and attorney's fees under 42 U.S.C. § 1988. On October 17, 1995, Plaintiff filed a First Amended Complaint on the same grounds, seeking similar relief, but additionally requesting a declaratory judgment that the "Red Hot" is located in a CG zone under the "Interim Specific Plan."[3] On October 17, 1995, Plaintiff applied for a prelimi-

---

2. In its prior Order, the Court permanently enjoined the City from enforcing its conditional use permit and live entertainment permit ordinances. Therefore, adult entertainment is now unconditionally permitted in CG zones. *See* Order (dated 11/27/95) at 26.

3. On November 16, 1995, the City filed an Answer to Plaintiff's First Amended Complaint. In its Answer, Defendant demanded a jury trial.

nary injunction to enjoin the City from enforcing its IG zone regulations as to Plaintiff individually, and, in the alternative, to enjoin the City from enforcing its adult business zoning regulations generally.

Also on October 17, 1995, Plaintiff applied for a temporary restraining order ("TRO") to enjoin the enforcement of Pasadena's conditional use permit and live entertainment permit ordinances. On October 26, 1995, the Court granted Plaintiff's TRO, thus enjoining the enforcement of the City's permitting ordinances. In the same Order, the Court consolidated the trial on the merits of Plaintiff's constitutional challenge to the permitting ordinances with the hearing on Plaintiff's application for a preliminary injunction. The consolidated trial and hearing took place before the Court on November 17, 1995. In its November 27, 1995 Order (amended by Minute Order on December 12, 1995), the Court permanently enjoined the City from enforcing its conditional use permit and live entertainment ordinances as to all expressive activities protected by the First Amendment. This Order constitutes the Court's conclusions with regard to Plaintiff's application for a preliminary injunction.

## II. Discussion

Plaintiff seeks a preliminary injunction that would enjoin the City from enforcing its IG zone regulations as to Plaintiff. First, Plaintiff argues that the Interim Specific Plan transformed the "Red Hot's" location into a CG zone. Therefore, Plaintiff argues that the City cannot enforce its IG zone regulations on Plaintiff. In the alternative, Plaintiff seeks a preliminary injunction that would enjoin the City from enforcing its ordinances dealing with adult entertainment altogether. Plaintiff asserts that this relief is necessary because Pasadena's adult business regulations are facially unconstitutional under *Renton, Walnut,* and *Topanga.* Under either theory, Plaintiff asserts that it is entitled to offer semi-nude "adult" entertainment at the "Red Hot Theatre/Cafe."

### A. Legal Standard for a Preliminary Injunction

In the Ninth Circuit, preliminary injunctive relief is appropriate where there is both probable success on the merits and a possibility of irreparable injury, *or* if there are serious questions on the merits and the balance of hardships tips sharply in the plaintiff's favor. *See* Schwarzer, et al., *Civil Procedure Before Trial* § 13:45; *Topanga,* 989 F.2d at 1528 (citing *Adultworld Bookstore v. City of Fresno,* 758 F.2d 1348, 1351 (9th Cir.1985)); *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir.1991); *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir.1987). In addition, because the primary purpose of a preliminary injunction is to preserve the status quo (*see Chalk v. United States District Court,* 840 F.2d 701, 704 (9th Cir.1988)), preliminary injunctions which change the status quo are "viewed with hesitancy and carry a *heavy burden of persuasion.*" Schwarzer, et al., *Civil Procedure* § 13:79 (citing *United States v. Veon,* 538 F.Supp. 237, 246 (E.D.Cal.1982)) (emphasis in original).

### B. The Interim Specific Plan

Plaintiff first seeks a preliminary injunction on the non-constitutional ground that, under Pasadena's own zoning laws, the "Red Hot" is actually in a CG zone (where adult entertainment is permitted). Plaintiff argues that pursuant to the "Interim Specific Plan," given effect by the City Council on January 23, 1995, Plaintiff's restaurant's location was rezoned as a Commercial General ("CG") zone. Accordingly, Plaintiff seeks an Order preliminarily enjoining the City from enforcing its IG zone restrictions on Plaintiff. In response, the City argues that the "Interim Specific Plan" was never adopted or certified by the City Council. Therefore, because the Interim Plan is *not* in effect, Plaintiff is still located in an IG zone and cannot offer adult entertainment.

#### 1. Likelihood of Success on the Merits/Serious Questions on the Merits

It is undisputed that if the Interim East Pasadena Specific Plan ("Interim Specific Plan") has actually gone into effect, Plaintiff is in a CG zone, not an IG zone. *See* James Decl. ¶ 24 ("The draft East Pasadena Specific Plan presented to City Council on January 23, 1995, if adopted by the City

Council in its present form, would designate Red Hot's property with a land use designation of CG."). Plaintiff argues that because the Interim Specific Plan rezoned the "Red Hot's" location as a CG zone, and Pasadena's permitting ordinances have been invalidated, it can offer "adult" entertainment immediately.

However, there is some dispute as to what the "Interim Specific Plan" really is. Plaintiff claims that the plain language of the Plan supplanted the City's prior zoning map as of January 23, 1995. And indeed, the language of the Interim Specific Plan does convey the strong impression that it is immediately effective:

> Following the interim effective date of this Specific Plan, whenever land use regulations and/or development standards are imposed, the same shall control the use and development of all lots in the Specific Plan area, to the exclusion of the regulations and/or development standards contained in the City of Pasadena Zoning Code, (as the same now exists or as the same hereafter be amended), to the extent as any provision of the Pasadena Zoning Code is inconsistent with any provision of the Specific Plan. Where the Specific Plan is silent, the zoning code shall control.

In addition, the language of the Interim Specific Plan states that:

> The provisions of this Specific Plan shall apply to all properties included in the Specific Plan area. No construction, modification, addition, placement or installation of any building or structure shall occur, nor shall any new use commence on any lot, on or after the interim effective date of this Specific Plan, except in conformity with the provisions of this Specific Plan.

The effective date of the plan was January 23, 1995. Thus, if the Interim Plan is in effect, its terms govern development in Pasadena. And, as stated above, if adopted, the Interim Specific Plan changes Plaintiff's zone from an IG zone to a CG zone.

However, the City argues that this Interim Specific Plan was never actually adopted by

the City Council. Jane Rodriguez, the Acting City Clerk for the City of Pasadena declares that she has "reviewed the minutes of the January 23, 1995 City Council meeting and determined that there was no resolution or ordinance adopting the Draft East Pasadena Specific Plan on that date. [She] also conducted a diligent search of the City records from January 23, 1995 to the present and [has] found no ordinance or resolution adopting the Draft East Pasadena Specific Plan[.]" Rodriguez Decl. ¶ 2. At the preliminary injunction hearing, Ms. Rodriguez was not cross-examined regarding this statement. In addition, Alvin James, the Director of Planning and Permitting for the City of Pasadena, also declares that the Interim Plan was never actually adopted or made effective by the City Council. Rather, the Council directed the City staff (including him) to:

a. Prepare an Environmental Impact Report ("EIR") on the project;

b. Prepare proposed amendments to the City's General Plan to achieve consistency between the General Plan and the East Pasadena Specific Plan; and

c. Prepare proposed amendments to the City's Zoning Ordinance, Title 17 of the City's Municipal Code, to achieve consistency between the City's zoning and the East Pasadena Specific Plan's regulations and designations.

James Decl. ¶ 20. Mr. James further asserts that the Interim Plan could not have taken effect because the City Council has not adopted zoning ordinances to conform to the plan. James Decl. ¶ 24.[4]

At the preliminary injunction hearing, Plaintiff conceded that the Interim Specific Plan was never actually adopted by the Pasadena City Council. However, Plaintiff asserts that even if not adopted, the Plan is in effect and enforceable. But aside from citing the language of the Plan, Plaintiff has not shown that Pasadena actually enforces the Plan. Indeed, most of the evidence points to the conclusion that the Specific Plan is *not* yet effective. First, the City has not yet

---

4. The fact that conforming zoning ordinances have not been adopted is not particularly relevant, considering that the language of the Inter-

im Plan expressly preempts contrary zoning ordinances. *See* Exhibit J, at p. 45.

completed an EIR on the Specific Plan, although such an EIR was requested by the City Council, and would be required by the California Environmental Quality Act ("CEQA").[5] *See A Local and Regional Monitor v. City of Los Angeles,* 16 Cal.App.4th 630, 640, 20 Cal.Rptr.2d 228 (1993) ("An EIR is required whenever a public agency proposes to approve or carry out any project which may have a significant effect on the environment."). Second, there has been no finding that the Interim Specific Plan is consistent with Pasadena's General Plan, as required by California law. *Id.* at 647, 20 Cal.Rptr.2d 228 (citing *Lesher Communications, Inc. v. City of Walnut Creek,* 52 Cal.3d 531, 535–36, 277 Cal.Rptr. 1, 802 P.2d 317 (1990)). Third, the Plan has not been adopted by the City Council, and there has been no formal mechanism for public comment on the plan. Therefore, it is reasonable to conclude that the interim plan is simply a "work in progress" or *proposed* plan which the City Council has referred back to its staff for action on the necessary steps prior to approval.

As the City asserted at the hearing, citing *Santa Fe Springs Realty Corp. v. City of Westminster,* 906 F.Supp. 1341, 1365–66 (C.D.Cal.1995), "[a] proposed plan, of course, is no plan at all." Thus, Plaintiff has not presented a likelihood of success on the merits of its claim that the "Red Hot" is now in a CG zone.[6] However, because the plain language of the Plan itself strongly implies that plan would be effective on January 23, 1995, even if contrary to zoning ordinances, Plaintiff has presented a "serious issue" on the merits as to whether the Interim Plan is currently effective. Therefore, the Court will analyze the balance of hardships involved in granting a preliminary injunction.

## 2. Balance of Hardships

 Plaintiff's main argument regarding harm is that its First Amendment rights are being infringed by the City's insistence that it is still in an IG zone, rather than a CG zone. But that argument is not particularly convincing with regard to the distinctly *non-constitutional* question of the effect of the Interim Specific Plan. Quite simply, there is no First Amendment right to be in a CG zone, versus an IG zone. Certainly, Plaintiff's First Amendment right to offer adult entertainment is restricted if Plaintiff is located in a zone which does not allow it. However, zoning ordinances that operate as time, place, or manner restrictions on speech are "acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Renton,* 475 U.S. at 47, 106 S.Ct. at 928. The Supreme Court has repeatedly upheld zoning schemes that restrict the location of adult businesses to a particular zone. *See Renton,* 475 U.S. at 52, 106 S.Ct. at 931 (a locality may "regulate adult [businesses] by dispersing them ... or by effectively concentrating them[.]"). Therefore, Plaintiff's desire to be in a CG zone rather than an IG zone is not a harm that the Constitution will recognize nor remedy.[7] The only other conceivable harm would be the delay involved in waiting for the Interim Plan to be adopted by the Council. But this is not "irreparable," and is not really a "harm." Indeed, it is possible that the City Council may *never* adopt the Interim Plan. Thus, the legally cognizable harm to Plaintiff will be minimal if the Court does not issue a preliminary injunction ordering the City to apply the terms of the Interim Specific Plan to Plaintiff. By contrast, a preliminary injunction declaring the Interim Specific Plan to be in effect would nullify much of the City's current zoning plan, without the benefit of an EIR, further action by the City Council, or any public comment. In addition, based upon the evidence before the Court, Plaintiff's requested preliminary injunction would greatly change the status quo. In-

---

**5.** At the hearing, the City stated that the EIR is still being prepared by the City staff.

**6.** At the hearing, Plaintiff did not present any witnesses or offer any affidavits proving that the City enforces the Interim Specific Plan, rather than the zoning ordinances.

**7.** Unless, of course, the zoning plan itself somehow violates the First Amendment, as Plaintiff also alleges.

deed, such a ruling would throw the City's zoning regulatory scheme into chaos.

Therefore, the balance of hardships clearly tips in the City's favor. The mere fact that Plaintiff is in an IG zone, but wants to be in a CG zone, is not a recognized constitutional harm.[8] In light of the harm to the City if the Court were to grant a preliminary injunction enforcing the Interim Specific Plan, such relief is clearly not warranted. Thus, Plaintiff's request for a preliminary injunction to enjoin the City from enforcing its IG zoning regulations on Plaintiff on this ground is denied.

## C. Constitutionality of the Adult Business Zoning Ordinances

Plaintiff also argues that the City should be preliminarily enjoined from enforcing its adult business zoning restrictions because they do not provide a reasonable opportunity for adult businesses to exist within City limits. The Court will analyze this claim through the lens of the preliminary injunction standard.

### 1. Likelihood of Success on the Merits/Serious Questions on the Merits

As stated, Plaintiff asserts that Pasadena's adult business zoning scheme should be preliminarily enjoined because it does not allow for "reasonable alternative avenues of communication." *Renton,* 475 U.S. at 50, 106 S.Ct. at 930. In essence, Plaintiff argues that Pasadena's ordinances leave an unconstitutionally small percentage of the City theoretically suitable for adult businesses. Because of this, Plaintiff asserts that Pasadena's adult business regulatory scheme is unconstitutional under *Renton,* as well as the Ninth Circuit's rulings in *Walnut* and *Topanga.*

■ The United States Supreme Court has long recognized that local governments may legitimately regulate or restrict the existence of adult businesses within their midst. *See Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 70–71, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) ("the State may legiti-

mately use the content of these materials as the basis for placing them in a different classification from other motion pictures."); *Renton,* 475 U.S. at 52, 106 S.Ct. at 931 (a locality may "regulate adult [businesses] by dispersing them ... or by effectively concentrating them[.]"); *see also Lakeland Lounge v. City of Jackson, Miss.,* 973 F.2d 1255, 1257 (5th Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 469 (1993) (an ordinance that does not ban adult businesses, but limits the areas of the city where they may operate is properly analyzed as a time, place, and manner regulation.). However, such regulations must not operate as a total suppression of non-obscene expression. *Young,* 427 U.S. at 70, 96 S.Ct. at 2452 ("the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value."). Indeed, in regulating erotic speech, a city must "refrain from effectively denying ... a reasonable opportunity to open and operate an adult [business] within the city." *Renton,* 475 U.S. at 54, 106 S.Ct. at 932. *See also Topanga,* 989 F.2d at 1529 (quoting *Renton*). In *Renton* itself, the Court found that the locality's zoning ordinances, which left 520 acres, or more than 5% of the entire land area of the city available to adult businesses, met the constitutional standard.

Since *Renton,* the lower courts have struggled to define the distinction between zoning regulations constituting a "total suppression," and regulations providing a "reasonable opportunity to open and operate an adult [business] within the city." *Renton,* 475 U.S. at 54, 106 S.Ct. at 932. Since *Renton,* the Ninth Circuit has fully addressed the issue twice. In *Walnut Properties, Inc. v. City of Whittier,* the court was presented with a zoning ordinance that effectively left only 12 acres (or 1.4% of the city's land area) theoretically available to adult businesses. *Walnut,* 861 F.2d at 1107. In its opinion, the Ninth Circuit noted that the Whittier ordinance, enacted *after* the plaintiff began offering adult entertainment, "would force the only existing adult theater in Whittier to close at its present location with no

---

**8.** This is especially true considering the fact that Plaintiff *voluntarily* chose to locate in an IG zone, well before the Interim Plan was considered on January 23, 1995.

definite prospect of a place to relocate." *Id.* at 1110. Faced with these facts, the court found that Whittier's zoning scheme did not provide a reasonable opportunity for adult businesses to exist. Therefore, the zoning scheme failed under *Renton.*

In *Topanga Press, Inc. v. City of Los Angeles,* the Ninth Circuit upheld the district court's grant of a preliminary injunction enjoining the City of Los Angeles from enforcing an ordinance that forced a large number of the city's 102 adult businesses to relocate to different parts of the city. Because there appeared to be an insufficient number of sites to accommodate a reasonable number of these businesses, the court held that there were serious questions on the merits of whether the city provided reasonable alternative avenues for expression under *Renton. Topanga,* 989 F.2d at 1534.

■■■ Like the opinions of other courts addressing the subject, neither *Walnut* or *Topanga* provided a bright line rule for determining whether or not a city has provided "a reasonable opportunity to open and operate an adult [business] within the city" (*Renton,* 475 U.S. at 53, 106 S.Ct. at 931–32), or whether adequate alternative sites exist for adult businesses.[9] Rather, it appears from the case law that a court must look to the facts of each case to determine the answer to this question. Nevertheless, there are certain ground rules that frame the analysis. The Supreme Court has held that adult busi-

nesses "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees[.]" *Renton,* 475 U.S. at 54, 106 S.Ct. at 932. Thus, for the purposes of the *Renton* analysis, it is not particularly relevant that "practically none of the undeveloped land is currently for sale or lease, and that in general there are no commercially viable adult [business] sites[.]" *Id.* at 53, 106 S.Ct. at 932; *Topanga,* 989 F.2d at 1529 (citing *Renton* ); *see also Woodall v. City of El Paso,* 49 F.3d 1120, 1126 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 516, 133 L.Ed.2d 425 (1995) (the fact that some of the sites were on less travelled roads or away from commercial development is not relevant under *Renton* ); *Lakeland,* 973 F.2d at 1260 (citing *SDJ, Inc. v. City of Houston,* 837 F.2d 1268, 1276–77 (5th Cir. 1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989)) ("alternative sites need not be commercially viable."). Thus, testimony that "no one would sell or lease property on which [an adult business] could relocate . . . [is] irrelevant to the First Amendment inquiry." *D.G. Restaurant Corp. v. City of Myrtle Beach,* 953 F.2d 140, 147 (4th Cir.1991) ("The decision to restrict adult businesses to a specific area does not oblige the city to provide commercially desirable land."); *Alexander v. City of Minneapolis,* 928 F.2d 278, 283 (8th Cir.1991) (citing same principle).[10]

■■ However, as the Ninth Circuit has stated, "the distinction between economical-

---

**9.** At the preliminary injunction hearing and in its papers, Plaintiff asserted that the Ninth Circuit in *Walnut* laid down a bright line rule that an ordinance leaving only 1.4% of the city available for adult businesses is per se unconstitutional. The Court disagrees. First, the *Walnut* court indicated that the preferable inquiry was the number of sites, not the raw percentage of land available. *Walnut,* 861 F.2d at 1108. Secondly, much of the court's opinion focused on the fact that Whittier's ordinance effectively forced the city's only adult theatre to shut down or relocate. *See Walnut,* 861 F.2d at 1110. And, because only 12 acres of the city were available, there was "no definite prospect of a place to relocate." *Id.* at 1110. Analyzing this combination of factors, the *Walnut* court found that the Whittier ordinance did not provide reasonable alternative avenues for expression. As stated above, the *Renton* analysis of necessity is a highly fact-

specific inquiry. *Walnut* is simply one particular application of the *Renton* analysis.

**10.** Accordingly, the declarations of Barry R. Lloyd and Roman Sanchez (presented by Plaintiff), in which they describe how they called leasing agents to ask whether they would lease to an adult business, are not relevant. *See Topanga,* 989 F.2d at 1532 (testimony concerning issue of "whether adult businesses would not be welcomed by landlords" is not relevant). Similarly, the declarations of real estate experts Bruce Bailey and Steven Soultanian are not relevant because they state that there must be a very large base of "potentially viable sites" for one adult business to have a reasonable opportunity to relocate. Unless Bailey and Soultanian are referring to the *Topanga* exclusions from the relevant real estate market (discussed in the text below), their discussion is not relevant because it addresses purely economic factors.

ly unsuitable and physically or practically unsuitable land is difficult to maintain." *Topanga,* 989 F.2d at 1529. Therefore, in analyzing whether a locality has provided adequate alternative sites, a court may look at some economic factors to determine "whether a specific relocation site *is part* of the relevant [real estate] market." *Id.* at 1530 (emphasis in original). Thus, in *Topanga,* the Ninth Circuit found some land areas simply unsuitable for commercial businesses, such as airport strips, sports stadiums, or other long term dedicated uses. *Id.* at 1532. Also, areas that are not readily accessible to the public (e.g. not accessible by roads or sidewalks) must be excluded from the relevant real estate market when performing the *Renton* analysis. *Id.* Other obviously unsuitable sites, such as swamps, land under the ocean, warehouses, or sewage plants are also not reasonably part of the relevant market. *Id.* at 1531.

After the "relevant real estate market" has been determined by using the *Topanga* factors, there is no constitutional requirement setting forth how many sites or what percentage of the land area must be available for adult businesses. *See Lakeland,* 973 F.2d at 1260 ("there is no requirement in *Renton* . . . that a specific proportion of a municipality be open for adult businesses or that a certain number of sites be available."); *City of National City v. Wiener,* 3 Cal.4th 832, 848, 12 Cal.Rptr.2d 701, 838 P.2d 223 (1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 85, 126 L.Ed.2d 53 (1993) ("We find no authority that mandates a constitutional ratio of adult businesses to a particular population figure."); *see also* fn. 9, above (holding that *Walnut* does not set down a bright line rule that a city must leave more than 1.4% of its land available to adult businesses). Thus, in determining whether a locality's zoning scheme provides a reasonable opportunity for expression, courts have looked to a variety of relevant factors, including the percentage of land theoretically available to adult businesses, the number of sites potentially available in relation to the population of the city, the number of sites compared with the existing number of adult businesses, or the number of businesses desiring to offer adult entertainment. *See, e.g., Woodall,* 49 F.3d at

1127 (looking at how many sites were available, as compared to businesses with demands for them); *Alexander,* 928 F.2d at 283 (finding that 6.6% of the city's land area, or 120 sites, were available to adult businesses.); *BBI Enterprises, Inc. v. City of Chicago,* 874 F.Supp. 890, 896 (N.D.Ill.1995) (looking at the relationship between the number of sites versus the locality's population).

■ In this case, under Pasadena's zoning ordinances, adult businesses are permitted in CG zones only. P.M.C. § 17.28.020. The exterior walls of a new adult business must be at least 500 feet "from the boundaries of a site occupied by a religious assembly, public or private school, general day care, or park and recreation facility use which existed prior to establishment of the adult business[.]" P.M.C. § 17.28.020. Furthermore, the exterior wall of a new adult business must be at least 1000 feet from the exterior wall of another adult business. *Id.* Given these distance requirements, it is clear that a court should not consider how many conceivable locations are available for the *first* adult business use. Indeed, there may be thousands of such sites. Rather, in light of the distance requirements, the more relevant inquiry is how many adult businesses can co-exist *at the same time. See BBI,* 874 F.Supp. at 895 ("the more sensible approach . . . is that the concept of 'reasonable opportunity' must relate to the prospective producers of adult use goods and services *as a group.*") (emphasis in original).

Reviewing the Pasadena Zoning Map lodged with the Court, CG zones are spread throughout the City, with large concentrations in the eastern portion along Colorado, Walnut, and Foothill Boulevards. *See also* James Supp.Decl. ¶¶ 13–17. Plaintiff has presented three declarations from Robert Lamishaw, owner of JPL Zoning Services, Inc., and a municipal planning expert, who has conducted a survey of Pasadena's "relevant" real estate market. Taking into account the *Topanga* exclusions, Pasadena's limitation of adult businesses to CG zones, and the distance restrictions discussed above, Lamishaw states that co-existing adult businesses are theoretically permissible in only 0.73% of the total Pasadena land area. Sec-

ond Lamishaw Decl. ¶ 3.[11] Plaintiff asserts that because such a small area of the City is theoretically available to adult businesses "as a group" (*BBI*, 874 F.Supp. at 895), the City's zoning scheme violates *Renton, Walnut* and *Topanga.*

The City responds that the more appropriate inquiry focuses upon the number of sites where adult businesses could co-exist, compared to the current demand for such uses (the number of adult businesses currently in operation). The City presents two declarations by Alvin James, the City's Director of Planning and Permitting. In his declarations, James asserts that, in light of the zoning restrictions and the *Topanga* exclusions, adult businesses can locate in up to a maximum of 26 sites in Pasadena.[12] The City argues that in light of the City's primarily residential identity,[13] its population of 135,000, and the fact that only *one* adult business currently exists in Pasadena, these 26 sites provide an ample opportunity for expression under *Renton.* James Decl. ¶ 3; *see Lakeland*, 973 F.2d at 1260 ("[g]iven the limited demand for sites for sexually oriented businesses," ordinance that left roughly 10 alternative sites for 5 existing businesses did not limit expression under *Renton* ); *see also BBI Enterprises*, 874 F.Supp. at 896 ("What is clearly a much more relevant basis for comparison is the relationship between (1) the number of a city's sites that are really available for adult uses and (2) that city's population—a relationship that speaks more directly in supply-and-demand terms.").

Given the foregoing discussion, it is evident that serious issues going to the merits create fair grounds for litigation in this case. *Adultworld*, 758 F.2d at 1351. This is especially true in light of the fact that zoning cases such as this one "present complex constitutional problems." *Id.* Plaintiff's showing that between only 0.73% and 0.95% of the City is theoretically available for adult businesses raises a concern that adult businesses do not have a reasonable opportunity to exist in Pasadena in violation of *Renton.*

However, the Court is not convinced that Plaintiff has presented a likelihood of success on the merits. As discussed, *Walnut* does not provide a bright line rule that 1.4% or more of a city must be available to adult businesses. Rather, the courts have looked to many relevant factors and the facts of each specific case. In light of the fundamentally residential nature of Pasadena, and in light of the fact that only one adult business currently exists in the City, a jury could reasonably find that Pasadena has provided an ample number of alternative sites for adult businesses to satisfy the demand for such expression, as well as the *Renton* standard.[14] Therefore, the Court does not find that Plaintiff has presented a likelihood of success on the merits of its challenge to Pasadena's zoning ordinances. However, because Plaintiff has presented "serious issues" going to the merits of its *Renton* challenge, the Court will now turn to the balance of hardships involved in the grant of a preliminary injunction.

---

**11.** The City disputes Lamishaw's findings on several grounds, most of which need not be discussed here. One of the grounds is that Lamishaw incorrectly calculated his percentage figure from the "gross" area of the city (including streets, sidewalks, and two major freeways). *See* James Suppl.Decl. ¶ 5. The City's expert, Alvin James, asserts that such a calculation should be based on the "net" figure. *Id.* Lamishaw responds that this is a distinction without much of a difference, because even with the "net" figure, only 0.95% of the City's net area is available for adult businesses, still below the 1.4% analyzed in *Walnut.* Second Lamishaw Decl. ¶ 17.

**12.** Lamishaw disputes this finding. He states that, in reality, there are between 11 and 16 sites theoretically available to adult businesses (as a group). The dispute stems from differences in

defining what will trigger a distance requirement (e.g. what constitutes a "child care center," a "church," or a "school" within the meaning of the zoning ordinances). In addition, James does *not specify whether a "site" is defined as a* parcel which could support a commercial building and parking. *See* Second Lamishaw Decl. ¶ 11.

**13.** James asserts that over 84% of the City's land "is included in the residential, public/semi-public or open space zones[.]" James Decl. ¶ 3.

**14.** This may be true whether the jury accepts James' estimate of 26 sites or Lamishaw's estimate of 11–16 sites. Further, the issue of how many sites are actually available is clearly an issue for trial.

## 2. Balance of Hardships

██ Plaintiff has made a showing that it will be harmed if the Court does not issue a preliminary injunction enjoining the City from enforcing its adult business zoning ordinances. Indeed, if Pasadena's adult business zoning ordinances remain in force, Plaintiff will be prevented from offering semi-nude dancing, a constitutionally protected activity.[15] "The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Ebel v. City of Corona,* 698 F.2d 390, 393 (9th Cir.1983). *See also Jacobsen v. U.S. Postal Service,* 812 F.2d 1151, 1154 (9th Cir. 1987) (violation of First Amendment rights "is, each day, an irreparable injury"); *San Diego Committee Against Registration and the Draft (Card) v. Governing Board of Grossmont Union High School District,* 790 F.2d 1471, 1473 n. 3 (9th Cir.1986) (quoting *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976)) ("The Supreme Court has noted that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury[.]' "). Thus, if Plaintiff's First Amendment rights are being violated, Plaintiff has demonstrated a possibility of potentially irreparable harm.

However, because the Court has found that Plaintiff has not demonstrated a likelihood of success on the merits of its *Renton* argument, and shown only serious questions going to the merits, Plaintiff must demonstrate that the balance of hardships tips "decidedly" in its favor. *Adultworld,* 758 F.2d at 1351 (citing *Ebel,* 698 F.2d at 392). Plaintiff clearly cannot meet this burden.

On the contrary, were this Court to grant a preliminary injunction enjoining the enforcement of the adult business ordinances, the harm to the *City* would be profound. In essence, the City would be prevented from enforcing its current zoning map, and would conceivably be forced to tolerate adult businesses throughout the City, or at least within close proximity to such sensitive uses as churches, schools or parks. This radical change would ensue without any public comment, without any time for legislative deliberation, without the benefit of an EIR, and without the opportunity to study the secondary effects of these adult businesses.

By contrast, aside from the potential harm to Plaintiff's First Amendment interests,[16] Plaintiff has not demonstrated a high degree of other harm. This case does not present the compelling facts addressed by the Ninth Circuit in *Topanga* or *Adultworld.* Both of those cases involved ordinances that operated to shut down a number of existing adult businesses and force them to relocate to a small number of sites in other parts of their cities. *See Topanga,* 989 F.2d at 1532–33 (roughly 102 adult businesses were forced to cease offering adult entertainment or relocate to a indeterminate number of possible sites.); *Adultworld,* 758 F.2d at 1351–52 (balance of hardships tipped dramatically toward plaintiffs because ordinance required nine of ten existing adult businesses to relocate, but relocation sites were "virtually non-existent."). By contrast, in this case, if Plaintiff does in fact desire to relocate and offer adult entertainment, it can move the "Red Hot" to a number of sites in the CG zone. If the "Red Hot" is the first such business to offer adult entertainment, the number of alternative sites could number in the hundreds. And, even if other adult businesses anticipate Plaintiff's effort and open first, Plaintiff still has between 11 and 26 sites to choose from (depending on which expert is correct). In short, the degree of harm to Plaintiff is minimal, compared to the potential harm and dislocation to the City resulting from the imposition of a preliminary injunction.

Therefore, for the foregoing reasons, the Court finds that Plaintiff has failed to show that the balance of hardships tips "decidedly" in its favor.[17]

---

15. Although, as discussed above, a city may use reasonable time, place and manner restrictions to regulate such constitutionally protected speech.

16. Which are, of course, uncertain, because of Plaintiff's failure to show a likelihood of success on the merits of its *Renton* argument.

17. Furthermore, because a preliminary injunction would greatly alter the status quo, such

### III. Conclusion

For the foregoing reasons, the Court ORDERS that Plaintiff's application for a preliminary injunction is DENIED.

**SO ORDERED.**

relief must be "viewed with hesitancy and carry a *heavy burden of persuasion.*" Schwarzer, et al., *Civil Procedure* § 13:79 (citing *Veon,* 538 F.Supp. at 246). For the reasons discussed above, Plaintiff has not met this burden.