Moshe LEVI and Simon Arouas,
doing business as The Reel
One, Plaintiffs,

v.

CITY OF ONTARIO, Defendant.

No. CV 96–7559 SVW (SHx).

United States District Court,
C.D. California.

Jan. 14, 1999.

Roger Jon Diamond, Santa Monica, CA, for plaintiffs.

Robert E. Dougherty, Eric S. Vail, Covington & Crowe, LLP, Ontario, CA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILSON, District Judge.

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

### I. *Procedural History*

Plaintiffs filed this action on October 28, 1996, seeking a declaration that Ontario's adult business zoning ordinance constitutes an unconstitutional restriction on adult speech and an injunction barring enforcement of the ordinance. Although Ontario also requires adult businesses to obtain a conditional use permit ("CUP"), Plaintiffs do not challenge the constitutionality of the CUP process.

In an order dated May 22, 1997, this Court held that Plaintiffs could not challenge the constitutionality of the Ontario ordinance as applied to their business because this claim was barred by the statute of limitations. Plaintiffs then proceeded with a facial challenge to the ordinance's constitutionality. As a result of the previous ruling, the Court excluded as irrelevant all evidence of how this ordinance affects these particular Plaintiffs. In a May 22, 1997, Order, this Court also rejected Plaintiff's motion for leave to file a first amended complaint to add a cause of action based on California law. On August 25, 1997, this Court denied Defendant's motion for summary judgment.

The parties appeared for court trial on February 5 and May 7, 1998. At the conclusion of each proceeding, the Court issued an order identifying the issues for trial and asking for further briefing. Based on the evidence adduced at trial and in accord with Fed.R.Civ.P. 52(a), the Court now enters its findings of fact and conclusions of law.

### II. *Findings of Fact*

#### A. *Ontario's Zoning Ordinance*

1. Prior to September 1991, Ontario permitted adult businesses in areas zoned C3 (Commercial Service).

2. In September 1991, Ontario amended its zoning structure to require adult businesses to locate in areas zoned M2.5 (Industrial Park).

3. In February 1992, Ontario again amended its zoning code, requiring adult businesses to locate only in areas zoned M2 (General Industrial). *See* Ontario Municipal Code ("OMC") §§ 9–3.1715(d), 9–3.2750.

4. Ontario's zoning of adult businesses is motivated by its desire to control adverse secondary effects associated with adult businesses. OMC §§ 9–3.1700(j)(5), (6).

5. Ontario relied on studies of the effects of adult businesses in Austin, Texas; Indianapolis, Indiana; Los Angeles, California; Phoenix, Arizona; and St. Paul, Minnesota in concluding that there was a need to regulate adult businesses through zoning. OMC § 9–3.1700(j)(3).

6. In addition to limiting adult businesses to the M2 zone, Ontario places further restrictions on the locations of such businesses:

a. No adult business may locate within 1,500 feet of

i. Property classified as agricultural or residential (including single family homes, estates, multiple dwellings or mobile home parks); OMC § 9–3.1715(d)(1)(A)(i);

ii. Any other residential use whether inside or outside the Ontario city limits; OMC § 9–3.1715(d)(1)(A)(ii);

iii. Any place of worship (such as a church or synagogue) whether in-

side or outside the Ontario city limits; OMC § 9–3.1715(d)(1)(A)(iii);

iv. Any school, day care center or private or public park or playground, whether inside or outside the Ontario city limits; OMC § 9–3.1715(d)(1)(A)(iv);

v. Any retirement or convalescent hospital, whether inside or outside the Ontario city limits; OMC § 9–3.1715(d)(1)(A)(v);

vi. Any recreational facility, such as an arcade, skating rink, bowling alley, etc., whether inside or outside the Ontario city limits; OMC § 9–3.1715(d)(1)(A)(vi);

vii. City Hall or other government buildings; OMC § 9–3.1715(d)(1)(A)(vii);

viii. Libraries whether inside or outside the Ontario city limits; OMC § 9–3.1715(d)(1)(A);

ix. Any truck stop whether inside or outside the Ontario city limits. OMC § 9–3.1715(d)(1)(A)(ix).

b. No adult business may locate within 300 feet of another adult business, whether inside or outside the Ontario city limits. OMC § 9–3.1715(d)(2)(B).

c. No adult business may be located on any lot having frontage on or adjacent to freeways or major arterial roads within the Ontario city limits. OMC § 9–3.1700(j)(7); OMC § 9–3.1715(d)(1)(D).

i. Wineville Avenue is not an arterial road.

7. Each of the potential sites within the M2 zone proposed by the City are also in the VI Vintage Industrial Overlay district.

a. Sites in the VI Vintage Industrial Overlay District must be at least one acre in area; OMC § 9–3.1960;

b. Buildings in the VI Vintage Industrial Overlay District must have a front yard of at least 50 feet; OMC § 9–3.1965.

c. Buildings in the VI Vintage Industrial Overlay District must have side yards of at least 10 feet; OMC § 9–3.1970. This area may be used for parking spaces. OMC § 9–3.1996.

d. Buildings in the VI Vintage Industrial Overlay District must have a floor-area ratio of 55% or less. OMC § 9–3.1996.

8. The code also provides that "[n]o residential structure or any other nonconforming structure shall be converted for use as an adult business"; OMC § 9–3.1715(d)(2)(B).

9. The code also requires that adult businesses meet specifications for lighting, security, general upkeep and to screen windows and take other precautions to ensure that the interior of the businesses is not visible from any public area. OMC § 9–3.1717(d)(2)(A)–(G).

10. Adult Businesses are also subject to a Conditional Use Permit process. OMC § 9–3.1705(a–1).

11. Ontario's municipal code limits the types of commercial establishments that may exist in M2 zones. Banks, electrical equipment sales, lumber yards, and restaurants are among the businesses permitted in the manufacturing zone. OMC § 9–3.1705.

12. The adult business ordinance provides for a two-year amortization period for businesses made nonconforming as a result of the ordinance. OMC § 9–3.3235(a).

13. The ordinance also provides for a mechanism through which the Ontario Planning Commission may extend the amortization period if it finds that the two-year period places an unreasonable burden on the adult business. OMC § 9–3.3237(c)(2).

### B. *Plaintiffs' Business*

1. Plaintiffs are the owners of "The Reel One," an adult bookstore, arcade and mini-theater located in an area of Ontario zoned C3 (Commercial Service).

2. In August 1991, when Plaintiffs acquired the business, Ontario permitted adult businesses in areas zoned C3.

3. The Reel One became a non-conforming business in September 1991 when Ontario amended its zoning ordinance to permit adult businesses only in areas zoned M2.5 (Industrial Park).

4. On April 24, 1994, the Ontario Planning Commission denied Plaintiffs' application for an "indefinite" extension of the amortization period, providing instead for a three-year extension to expire on March 19, 1997.

5. Plaintiffs appealed to the Ontario City Council, who affirmed the decision of the Planning Commission. Plaintiffs did not challenge either decision by seeking a writ of administrative mandamus.

6. To date, Plaintiffs have not sought a CUP for a location within the M2 area.

7. Plaintiffs' business currently operates pursuant to a agreement by the City not to enforce the ordinance until this case was heard on its merits.

### C. *Possible Sites*

The City proposes 25 sites as "available" for use by adult businesses.[1] *See* Def.'s ex. O.

[1] Exhibit "O" lists 26 sites. The City conceded at trial, however, that one site was not available. *See* Trans., 2/5/1998, at 65:23–66:1.

#### 1. *Site 23808140*[2]

This is a 2.655 acre site located on land currently used as a winery along Wineville Avenue. According to the City, this land must be subdivided in order to meet zoning specifications.

#### 2. *Site 23808138*

This is a 1.61 acre site on which are located two divisible mixed-use buildings. This property fronts on Airport Drive, which is defined as a major arterial road. Adult businesses may not locate on property fronting on major arterial roads. This site must therefore be subdivided.

#### 3. *Site 23808139*

This is a 1.945 acre site on which two divisible multi-tenant mixed-use buildings are located. This site could accommodate one adult business due to the zoning requirements setting forth the minimum distances between adult businesses. If site 23808138 is subdivided and an adult business is located on the portion of the property not fronting Airport Drive, then this property must also be subdivided in order to meet the minimum distance zoning requirements. The buildings on this site do not conform with the 50 foot setback requirement in the Vintage Industrial Overlay District.

#### 4. *Site 23808142*

This is a 26.738 acre site on which is currently located a 214,600 square foot warehouse. The City proposes the front portion of this property, currently used for a driveway and for landscaping, as a possible site for an adult business.

#### 5. *Site 23808175*

This is vacant land comprising 3.220 acres.

[2] For reference, these sites are identified by their "APN" numbers as shown on Def.'s ex. O.

6. *Site 23808177*

This is vacant land comprising 10.320 acres.

7. *Site 23808163*

This is vacant land comprising 5.006 acres.

8. *Site 23808123*

This is vacant land comprising 0.167 acre. This site fronts on property dedicated to Southern California Edison but is not immediately adjacent to an existing road.

9. *Site 23808124*

This is vacant land comprising 0.616 acres. This site fronts on the Southern California Edison easement but also abuts Santa Ana street.

10. *Site 23810174*

This is vacant land comprising 39.660 acres. This land fronts on Etiwanda Avenue, which is defined in the Ontario Master Plan as a major arterial road. This property would therefore require subdivision before it could legally serve as a site for an adult business.

11. *Site 23812141*

This is vacant land comprising 2.981 acres. This land fronts on Milliken Avenue, which is defined in the Ontario Master Plan as a major arterial road. This property would therefore require subdivision before it could legally serve as a site for an adult business.

12. *Site 23815117*

This is vacant land comprising 9.048 acres. According to the City, this land must be subdivided in order to meet current zoning specifications.

13. *Site 23815181*

This is vacant land comprising 10.480 acres.

14. *Site 23815180*

This is vacant land comprising 19.152 acres.

15. *Site 23815179*

This is vacant land comprising 10.356 acres.

16. *Site 23815190*

This is vacant land comprising 12.908 acres.

17. *Site 23813211*

This is a 10.890 acre site on which is currently located a 5568 square foot warehouse. The City proposes the portion of the property closest to the street as a potential site for an adult business. This site would also need to be subdivided in order to comply with zoning requirements.

18. *Site 23816119*

This is a 4.00 acre site on which stands a 32,256 square foot warehouse. The City proposes the southern portion of the property as a potential site for an adult business.

19. *Site 23816133*

This is vacant land comprising 17.910 acres.

20. *Site 23813323*

This is vacant land comprising 5.400 acres.

21. *Site 23813328*

This is vacant land comprising 7.231 acres.

22. *Site 23813339*

This is vacant land comprising 5.764 acres.

23. *Site 23813327*

This is a 5.007 acre site on which is currently located a 48,434 square foot

warehouse. The City proposes the southern half of the property as a potential site for an adult business.

### 24. *Site 23813335*

This is an 8.000 acre site on which is currently located a 57,984 square foot warehouse. The City proposes the eastern half of the property as a potential site for an adult business.

### 25. *Site 23816148*

This is a 33.880 acre site on which is currently located a 504,576 square foot warehouse. The City proposes that western half of the property as a potential site for an adult business. This site would also need to be subdivided in order to comply with zoning requirements.

### D. *Number of Businesses*

There are currently two adult businesses (including Plaintiffs') operating within the Ontario City Limits.

### III. *Conclusions of Law*

### A. *Burden of Proof*

▉ The Ontario ordinance constitutes a time, place and manner restriction on speech. *See City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 63, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). As such, it meets constitutional scrutiny if it is (a) justified without reference to the content of the regulated speech (is "content neutral"); (b) narrowly tailored to serve a significant governmental interest; and (c) leaves open ample alternative channels of communication. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Plaintiffs appear to concede that the ordinance is content neutral and narrowly tailored. This case therefore turns on whether the City has provided reasonable alternative means of expression.

Plaintiffs argue that the City bears the burden of proving that the ordinance leaves open reasonable alternative channels. Plaintiffs cite a number of Supreme Court cases involving political or other classic forms of protected speech in which the Court expressly or impliedly placed the burden on the party defending the constitutionality of the ordinance. *See, e.g. City of Ladue v. Gilleo,* 512 U.S. 43, 56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (holding, in the face of a challenge to a ban on lawn signs, that the City had failed to persuade the Court of the existence of adequate alternative forms of communication); *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 75–77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (finding that the Borough failed to establish that a total ban on live adult entertainment satisfied the requirements of a reasonable time, place and manner restriction).

The Supreme Court has never expressly held that adult speech is entitled to less protection than other forms of speech. *See, e.g. Reno v. American Civil Liberties Union,* 521 U.S. 844, ——, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997) (" 'Sexual expression which is indecent but not obscene is protected by the First Amendment.' ") (citation omitted). *But see Young v. American Mini–Theatres,* 427 U.S. 50, 70, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion) ("[S]ociety's interest in protecting [erotic speech] is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate."). As a practical matter, however, the Court has upheld time, place and manner restrictions on speech that would not pass constitutional muster if applied to other forms of speech. *See, e.g., City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 57, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (Brennan, J. dissenting) (arguing that the Renton ordinance is an unconstitutional content-based restriction on speech).

▉ Because adult entertainment has not been given the same broad protection afforded other forms of speech, the proper

analogy is not to cases like *Ladue*, which deal with restrictions on political speech, but cases involving commercial speech—which, as a matter of law, is entitled to a lesser degree of constitutional protection. *See, e.g. Central Hudson Gas & Electric Corp. v. Public Service. Comm'n of New York*, 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). In these cases, the Court has also consistently placed this burden on the municipality. For example, in *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the city, citing an interest in safety and aesthetics, banned the use of freestanding newsracks located on public property to distribute commercial publications. 507 U.S. at 412, 113 S.Ct. 1505. In holding the ordinance unconstitutional, the Court placed the burden of establishing constitutionality on the city. "It was the city's burden to establish a 'reasonable fit' between its legitimate interest in safety and esthetics [sic] and its choice of a limited and selective prohibition of newsracks as the means chosen to serve those interests." *Id.* at 416, 113 S.Ct. 1505. Similarly, in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Court placed the burden on the government to establish the constitutionality of a ban on the mailing of unsolicited advertisements for contraceptives. "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Id.* at 71 n. 20, 103 S.Ct. 2875.

The burden would be on the City to prove that regulation of commercial speech would be constitutional, therefore, the burden must also lie with the City to prove the constitutionality of its adult business restrictions. This conclusion comports with a number of recent cases. In the

Third Circuit's en banc decision in *Phillips v. Borough of Keyport*, 107 F.3d 164 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 261 (1997), which considered a challenge to the Borough's "adult entertainment uses" ordinance, the court placed the burden on the Borough to build

> an evidentiary record that will support a finding that it reasonably believed [its] interest would be jeopardized in the absence of an ordinance and that this ordinance is reasonably tailored to promote those interests. It is the Borough that carries the burdens of production and persuasion here, not the plaintiffs.

*Id.* at 173. Moreover, "the existence of adequate alternative channels for adult entertainment expression is an essential element for the state to satisfy." *Id.* at 177. *See also, J & B Entertainment, Inc. v. City of Jackson*, 152 F.3d 362, 370–71 (5th Cir.1998) (citing *Phillips* and concluding that under the "intermediate scrutiny standard of review, the government bears the burden of justifying (i.e., both the burden of production and persuasion) the challenged statute"); *Hickerson v. City of New York*, 146 F.3d 99, 107 (2d Cir.1998), *petition for cert. filed,* —— U.S. ——, 119 S.Ct. 795, —— L.Ed.2d —— (1999) (98–574) (explaining that municipalities must identify "general areas that remain available" but not "exact locations to which adult establishments may relocate").[3] *Phillips* comports with the body of law placing the burden of proving the constitutionality of governmental restrictions on commercial speech on the regulating body. Accordingly, this Court will follow *Phillips* and place the burden of proof in this action on the City.

---

**3.** Some cases have reached the opposite conclusion. In *Woodall v. City of El Paso*, 49 F.3d 1120 (5th Cir.), *cert. denied,* 516 U.S. 988, 116 S.Ct. 516, 133 L.Ed.2d 425 (1995), the Fifth Circuit placed the burden on the plaintiff to prove that the City failed to provide reasonable adequate alternative avenues of communication. *See also Lim v. City of*

*Long Beach*, 12 F.Supp.2d 1050, 1064–65 (C.D.Cal.1998) (finding that plaintiff bears burden of persuasion that alternative sites do not suffice). The Court notes that the more recent Fifth Circuit opinion in *J & B* reaches the opposite result of *Woodall* on this point, without mentioning *Woodall*, and cites *Phillips* with approval.

## B. *Legal Standard*

■ A local government may regulate or restrict adult businesses as long as reasonable alternative avenues of communication remain. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). "The test for determining whether the [Plaintiffs'] First Amendment rights are threatened is whether a local government has effectively denied [them] a reasonable opportunity to open and operate their enterprise within the city in question." *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1529 (9th Cir.1993) (quoting *Renton*, 475 U.S. at 54, 106 S.Ct. 925); *see also Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1107 (9th Cir.1992) (quoting *Renton*).

■ While the inquiry into the adequacy of alternative sites is highly fact-specific, the cases set forth some general principles on which this Court may base its conclusion. First, Plaintiffs "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees." *Renton*, 475 U.S. at 54, 106 S.Ct. 925. Thus, "the possible economic impact upon a business is not a factor to be considered ... when determining whether a city has provided a business with a reasonable alternative location." *Topanga Press*, 989 F.2d at 1529.

■ Economics are relevant, however, to the question of whether a particular site is a part of the relevant real estate market. *Id.* at 1530. "[A]lthough *Renton* stressed that the First Amendment only requires a relocation site to be potentially available rather than actually available, the requirement of potentiality connotes genuine possibility." *Id.* at 1531. Thus, property is not part of the relevant market if it lacks a proper infrastructure, such as roads, lighting, water, or sewer service. *Id.* Nor does the relevant market include property that is physically incompatible with commercial enterprise, such as a warehouse, a sewage treatment plant, a swamp, a shipyard or an airport runway. *Id.* The focus is not on the particular needs of an adult business. Rather, the Court must determine whether potential sites are reasonable relocation sites for some generic commercial enterprise before it considers them part of the relevant market. *Id.*

## C. *Application*

The Ontario ordinance, by its terms, requires all adult businesses to locate in areas zoned M2 or general industrial. Sites located in manufacturing or industrial zones may be part of the relevant market if (1) they are reasonably accessible to the general public; (2) they have a "proper infra-structure," such as sidewalks, roads and lighting; and (3) they suit some "generic commercial enterprise," even if the site is unsuitable for an adult business or any other specific business. *Topanga Press*, 989 F.2d at 1531. An ordinance is not invalid merely because all of the potential sites are located in industrial zones. *See Z.J. Gifts D–2, L.L.C. v. City of Aurora*, 136 F.3d 683, 688 (10th Cir.1998).

■ Seven of the City's proposed sites—23808140, 23808138, 23810174, 23812141, 23815117, 23813211, and 23816148—would have to be subdivided in order to meet zoning requirements for adult businesses. In other words, as a matter of law, an adult business could not locate on one of these sites without a change in the legal status of the site. It strains credulity to believe that sites on which an adult business cannot legally operate are reasonable adequate alternatives. These sites are thus not part of the relevant market and must be excluded from the analysis.

■ Similarly, four of the City's proposed sites—23808142, 23816119, 23813327, and 23713335—are contiguous parcels which are partially developed in a manner inconsistent with commercial use. "[P]roperty is not 'potentially' available when it is unreasonable to believe that it would ever become available to any com-

mercial enterprise." *Topanga Press,* 989 F.2d at 1531. The fact that portions of these sites have been developed as warehouses or similar uses undermines the City's argument that these sites could become available for commercial use at some time in the future. Nor does the City provide any evidence of a reasonable expectation of mixed-use development of this sort on these or similar parcels. The Court thus concludes that these sites are not within the relevant market for a general commercial enterprise in Ontario.

■ Thirteen of the remaining proposed sites are vacant land. Eleven of these sites are parcels of 3.2 acres or greater, with seven sites greater than 10 acres. Defendants contend that, notwithstanding the size of these parcels, they are "potentially available sites" because they could be either subdivided for free standing structures or developed for multi-tenant use. As with those sites on which some development has already occurred, Defendants provide no evidence of a real possibility of commercial development on these sites. Moreover, the City offers no evidence that the sites contain the required infrastructure—water, sewer, sidewalks, etc.—to support a generic commercial enterprise. Accordingly, the Court concludes that these sites are also outside the relevant market.

Eliminating these locations leaves the City with three potential sites. Site 23808139 contains two multi-use, multi-tenant buildings on which one adult bookstore could locate. Because the Court has determined that site 23808138 is outside the relevant market, there is no need to subdivide this site. Moreover, although the OMC prohibits some commercial businesses from locating in the M2 zone, it permits a sufficient variety of other businesses to make the zone available to the "generic commercial enterprise." The Court thus concludes that this site is potentially available to a generic commercial enterprise. *See Woodall,* 49 F.3d at 1126 (holding that large multi-tenant, office-

warehouse buildings in which retail businesses could and occasionally did locate were part of the relevant market).

The buildings on site 23808139 are nonconforming in that they do not comply with the setback requirements for the Vintage Industrial Overlay District. Ontario prohibits the conversion of "residential structure[s] or other nonconforming structures" for use as adult businesses. OMC § 9–3.1715. Plaintiffs argue that they are prohibited from locating in these buildings by this code provision, and therefore this site is outside the relevant market. Scott Murphy, assistant City Planner for the City of Ontario, testified at trial that locating an adult bookstore in an existing commercial building was not a "conversion" and thus did not trigger the prohibition in OMC § 9–3.1715. The Court credits Murphy's testimony and holds that a change in use from a generic commercial enterprise to an adult bookstore is not a conversion. Site 23808139 is therefore not affected by OMC § 9–3.1715.

Sites 23808124 and 23808123 are both vacant land comprising less than one acre. The Vintage Overlay District requires sites to be of a size greater than one acre. OMC § 9–3.1960. Site 23808124 is 0.616 acres and thus appears to be too small for use in the Vintage Overlay District. Absent the one-acre limit, this site has no other defects which would remove it from the relevant market. Because of the size requirement, however, the Court must find that this site is not potentially available to a generic commercial enterprise. The second site, 23808123 comprises 0.167 acres. This site is not serviced by an existing road. *See* Def.'s ex. P–9. Sites such as this which lack "a proper infrastructure such as sidewalks, roads and lighting" are outside the relevant market. *See Topanga Press,* 989 F.2d at 1531.

In sum, only one of the 25 sites proposed by the City are, in fact, within the relevant market for a generic commercial business.

### D. *Numerosity*

Once the relevant market is properly defined, the Court must then determine whether the market contains an adequate number of potential sites. *Id.* at 1530.

> [I]n determining whether a locality's zoning scheme provides a reasonable opportunity for expression, courts have looked to a variety of relevant factors, including the percentage of land theoretically available to adult businesses, the number of sites potentially available in relation to the population of the city, the number of sites compared with the existing number of adult businesses, or the number of businesses desiring to offer adult entertainment.

*3570 East Foothill Blvd., Inc. v. City of Pasadena ("3570 East Foothill Blvd I ")*, 912 F.Supp. 1257, 1265 (C.D.Cal.1995), *aff'd* 99 F.3d 1147 (9th Cir.1996). There is no constitutional requirement that a city make available a certain number of sites, *Lakeland Lounge. of Jackson, Inc. v. City of Jackson, Miss.*, 973 F.2d 1255, 1260 (5th Cir.1992), or a certain percentage of land. *3570 East Foothill Blvd.*, 912 F.Supp. at 1264 n. 9 (holding that the percentage of land is relevant, but not dispositive to the analysis). Nor is it "particularly relevant" that almost none of the sites are, in fact, unavailable, because they are currently occupied or because the owner of the site would not rent or sell to an adult business. *Id.*

 Whether an ordinance provides adequate alternative means of communication is measured according to a reasonableness standard taking into account "community needs, the incidence of nude bars in other comparable communities, the goals of the city plan and the kind of city the plan works towards [sic]." *International Food & Beverage Systems v. City of Fort Lauderdale,* 794 F.2d 1520, 1522 (11th Cir.1986); *Young v. City of Simi Valley,* 977 F.Supp. 1017, 1019 (C.D.Cal. 1997). Courts facing this question have implied that, at a minimum, there must be more sites available than existing businesses with a demand for them. *See Woodall,* 49 F.3d at 1127 (ordinance permitting at least forty sites for 22 existing businesses was reasonable "as a matter of arithmetic"); *3570 East Foothill Blvd., Inc. v. City of Pasadena,* ("*3570 East Foothill Blvd. II* ") 980 F.Supp. 329, 343 (C.D.Cal.1997) (ordinance permitting 11 to 16 sites sufficient for city of 135,000 with one existing adult business). At present, the Ontario ordinance permits only one site for which the two existing businesses must compete. Even if the 0.616 acre parcel, 23808124, were included, Ontario would permit only two possible locations for its two existing businesses. This is an unreasonably, and therefore unconstitutionally, low number of sites.

The Court concludes that the City of Ontario's adult zoning ordinance fails to provide reasonable alternative avenues of communication and thus violates the First Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment. Defendant is therefore PERMANENTLY ENJOINED from enforcing its current adult business zoning scheme.

IT IS SO ORDERED.