Seung Chun **LIM, Fluffy, Inc., 5436 Santa Monica Boulevard, Inc., Plaintiffs,**

v.

**CITY OF LONG BEACH, Defendant.**

**No. CV 96–2742 RAP (RMBx).**

United States District Court, C.D. California.

May 15, 1998.

Roger Jon Diamond, Roger J. Diamond Law Offices, Santa Monica, CA, for plaintiffs.

John Rains Calhoun, Daniel S. Murphy, Long Beach City Attorney, Long Beach, CA, for defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER DISSOLVING PRELIMINARY INJUNCTION AND DIRECTING ENTRY OF JUDGMENT**

PAEZ, District Judge.

### I.

#### *Introduction*

Plaintiffs own and operate three adult book and video stores and a mini-theater in the City of Long Beach (the "City") On October 18, 1994, the City enacted an Ordinance regulating the location of adult enter-

tainment establishments (the "1994 Ordinance") Plaintiffs assert First Amendment and Equal Protection challenges to the application of the 1994 Ordinance to their businesses. Plaintiffs allege that the 1994 Ordinance as applied to them violates the First Amendment because it impermissibly limits the number of alternative channels of communication for exercise of their free speech rights. Plaintiffs also contend that the Ordinance denies them the equal protection of the law because it forces nonconforming adult business to relocate or cease operating their businesses, while other nonconforming but non-adult businesses are permitted to remain indefinitely.

Having carefully considered all the evidence admitted at trial and the parties' post-trial briefs, proposed findings of fact and conclusions of law, and post-trial oral arguments, the Court now makes the following findings of fact and conclusions of law and orders entry of judgment for the City.

In making its findings, the Court first sets forth the history of the 1994 Ordinance, factual details regarding each of the plaintiffs and a brief review of prior litigation among the parties. Thereafter, the Court sets forth its findings with respect to each of the potentially available alternative sites for use as an adult business. Ultimately, the Court concludes that the 1994 Ordinance as applied to plaintiffs provides a sufficient number of alternative locations for expression to satisfy the First Amendment. The Court further concludes that the 1994 Ordinance does not deny plaintiffs the equal protection of the law. Accordingly, judgment shall be entered in favor of the City dismissing this action on the merits and vacating the stipulated preliminary injunction entered by the Court.

## II.

### Findings of Fact

**A. The 1977 Ordinance**

1. On September 15, 1977 and October 6, 1977, the Planning Commission of the City of Long Beach held several hearings regarding the adoption of an "adult entertainment" ordinance that would restrict the location of new adult entertainment businesses.

2. As part of its deliberations, the Planning Commission considered a 1977 study by the City of Los Angeles regarding the deleterious effects of the concentration in particular areas of adult entertainment establishments.

3. Following its review of the proposed ordinance, the Planning Commission recommended to the Long Beach City Council that it adopt an adult entertainment zoning ordinance restricting the location of such businesses. The City Council enacted such an ordinance in 1977 ("the 1977 Ordinance"). The 1977 Ordinance was codified in §§ 21.15.110 and 21.45.110 of the Long Beach Municipal Code ("LBMC").

4. "Section 21.15.110 define[d] adult entertainment uses to include bookstores, hotels, theaters, night clubs, massage parlors, sexual encounter centers and model studios which exhibite[d] specified anatomical areas or specified sexual activities. LBMC § 21.45.110 provide[d] that such adult entertainment uses may not be located within (1) 500 feet of any area zoned for residential use; (2) 1,000 feet of any other adult entertainment business; and (3) 1,000 feet of any public or private school, park, playground, public building, church, any noncommercial establishment operated by a bonafide religious organization, or any establishment likely to be used my minors." Exhibit 208 at 1. LBMC § 21.45.110 also provided standards for a variance procedure whereby property and business owners could seek relief from the locational requirements.

5. The 1977 Ordinance only applied to *new* adult entertainment uses; it left the then-existing adult entertainment businesses unaffected.

6. In applying the locational requirements of LBMC § 21.45.110, the City does not consider the existing uses of property located in adjoining cities.

7. The locational restrictions of LBMC § 21.45.110 as applied to city parks are limited to the "city parks" identified by the City of Long Beach's Parks and Recreation Department. *See* Exhibit 224. The traffic circle, marinas, and golf courses are not city parks.

## B. *The 1988 Ordinance*

8. In 1988, the City's Planning Department undertook a study and evaluation of the 1977 Ordinance to determine whether the locational restrictions on adult entertainment businesses had the effect of eliminating such businesses from the buffer areas established by the 1977 Ordinance. The Planning Department found that the existing ordinance had no effect upon the location of adult entertainment businesses. After holding public hearings, the Planning Commission ultimately recommended to the City Council that it amend the 1977 adult entertainment ordinance to require all *existing* nonconforming adult establishments to comply with the locational requirements or cease conducting business. Subsequently, the City Council adopted Ordinance C–6533, codified at LBMC § 21.27.150 (the "1988 Ordinance"), which required all existing nonconforming adult entertainment businesses to comply with the locational requirements within two years. The 1988 Ordinance further provided that if certain conditions were met, the owners of such businesses could obtain a three year extension of the amortization period ending on August 1, 1993.

## C. *The 1994 Ordinance*

9. On August 18, 1994 and September 1, 1994, the Planning Commission held hearings on several proposed amendments to the adult entertainment ordinance. The purpose of these amendments was to reduce the size of several of the buffer zones, thereby making the locational requirements for adult businesses less restrictive.

10. On September 20, 1994 and October 11, 1994, the Planning Commission filed several reports with the City Council recommending modifications in the buffer zones and allowing a three year amortization period for nonconforming businesses to comply with the amended ordinance.

11. On October 18, 1994, the City Council adopted Ordinance C–7274 (the "1994 Ordinance"). *See* Exhibit 213. The 1994 Ordinance modified the adult entertainment buffer zones, required compliance with the City's parking requirements, and established an eighteen month amortization period (through May 18, 1996) for existing nonconforming businesses to comply with the less restrictive locational requirements. LBMC § 21.27.150. In adopting the 1994 Ordinance, the City Council relied upon studies from other cities including Garden Grove, California; Minneapolis, Minnesota; St. Paul, Minnesota; Indianapolis, Indiana; and Phoenix, Arizona.

12. LBMC § 21.15.110, as amended in 1994, defines adult business entertainment to include: (1) "adult bookstores" having twenty percent or more of their stock in trade in books, magazines and other periodicals, video tapes or other similar materials on display or available for sale or viewing on the premises which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas; (2) "adult mini-motion picture theater" having the capacity for less than fifty persons, and which is used for presenting, on a regular and substantial basis, material distinguished or characterized by an emphasis on matter depicting or relating to specified sexual activities or specified anatomical areas for observation by patrons in the facility; and (3) "adult motion picture arcade" where the public is permitted or invited and where coin or slug-operated or electronically or mechanically controlled still or motion picture machines, projectors or other image-producing devices are maintained to show images on a regular and substantial basis, where the images so displayed are distinguished or characterized by an emphasis on depicting or describing specific sexual activities or specified anatomical areas.

13. Under LBMC § 21.45.110(A)(1), as amended in 1994, an adult entertainment business may not be located (1) within 300 feet of a residential zoning district or residential planned development district within the City (specifically excluding mixed-use zones); (2) within one thousand feet of any public or private school (kindergarten through twelfth grade) located within the City; (3) within 600 feet of any City park; (4) within 500 feet of a church; (5) within 1000 feet of any other adult entertainment business. Exhibit 213 at 8.

14. LBMC · § 21.45.110(A)(1)(f) further provides that an adult entertainment busi-

ness may not be located in the following areas:

Fronting upon that portion of Pacific Coast Highway between Hayes and Termino Avenue, that portion of Anaheim Street between the Long Beach Freeway and Termino Avenue, that portion of Santa Fe Avenue between Anaheim Street and Pacific Coast Highway and that portion of Artesia Boulevard between Paramount Boulevard and Downey Avenue, and that portion of Broadway between Atlantic Avenue and Euclid Avenue. Such areas have been determined by the Long Beach Police Department to experience a high rate of arrests for prostitution, lewd behavior and disorderly conduct. Such determination shall be reviewed in three (3) year intervals, commencing upon October 1, 1997.

15. LBMC § 21.45.110, as amended in 1994, also provides that "adult entertainment businesses shall comply with the parking requirements set forth in Chapter 21.41 (off-street parking and loading requirements). The number of parking spaces provided shall be the equivalent to that required for new construction, regardless of the status of the legal nonconforming parking rights of the previous use." Exhibit 213 at 9.

16. LBMC § 21.52.201(A), which governs conditional use permits for alcoholic beverage sales uses, provides that "[t]he operator of this use shall provide parking for the use equivalent to the parking required for new construction regardless of the status of the previous use as to legal nonconforming rights." Exhibit 218 at Z–303.

17. LBMC § 21.45.300, which establishes an amortization period for nonconforming open storage and uses, provides: "all open commercial uses not specifically permitted by this Chapter shall be prohibited on the effective date of the ordinance codified in this section as an amendment to the zoning regulations and all legal nonconforming open uses." Exhibit 218 at Z–248a.

18. LBMC § 21.44.400, which governs the elimination of nonconforming on-premises signs, provides that a nonconforming sign shall be removed or brought into compliance with the requirements of Chapter 21.44 within one year of the effective date of a new

owner's or lessee's business license. Exhibit 218 at Z–273.

## D. *Plaintiffs*

19. Plaintiff Seung Chun Lim owns two businesses defined by LBMC 21.15.110(A)(C) as adult bookstores and adult motion picture arcades. These two bookstores are located at 1529 West Pacific Coast Highway ("Pacific World") and 6037–39 Atlantic Avenue ("T & C World").

20. The Pacific World Bookstore operated by Mr. Lim occupies 1,500 square feet. Mr. Lim sells adult books, and four video arcade machines are available to customers. T & C World Bookstore is similar to the Pacific World Bookstore. There is no evidence that Mr. Lim made any attempt to relocate either bookstore prior to or after plaintiff filed this lawsuit.

21. Plaintiff Fluffy, Inc. is a California corporation that owns the South Seas Adult Bookstore located at 1567 West Pacific Coast Highway. Its business is defined as an adult bookstore by LBMC § 21.15.110(A).

22. Robert Blake is the President of Fluffy, Inc. He testified that the South Seas Adult Bookstore has been located at 1567 West Pacific Coast Highway for twelve years. The present location consists of approximately 1,200 square feet. The bookstore sells adult books, video tapes and novelty items. Several adult video arcade machines are located in the store.

23. Although Mr. Blake consulted with a real estate agent regarding the availability of other locations for the bookstore and hired experts in connection with this litigation, he has not made any attempt to relocate the bookstore. Mr. Blake testified that he has not attempted to relocate because the City of Long Beach has yet to prove that he must move to a new location.

24. Plaintiff 5436 Santa Monica Boulevard, Inc. is a corporation that owns the Front Door Adult Theater and Bookstore at 5832–34 North Atlantic Boulevard. It, too, is an adult business as defined by LBMC §§ 21.15.110(a) and (b).

25. Larry Sphar is the principal officer of 5436 Santa Monica Boulevard, Inc., which owns the Front Door Adult Theater and

Bookstore. This adult business consists of a mini-theater and bookstore. It occupies approximately 3,000 square feet. Mr. Sphar has looked for other suitable locations for his adult business but has not found what he considers to be a reasonable alternative site. He has contacted realtors and potential lessors regarding the availability of suitable alternative locations. He considered purchasing a building on Cherry Avenue, near the 405 Freeway, but he rejected this location because the seller wanted $1.3 million dollars for the building. According to Mr. Sphar, this option would not have been "a good business decision."

26. All of plaintiffs' businesses are located within 300 feet of a residential district.

27. Two of plaintiffs' businesses are located in the area described in § 21.45.110(A)(1)(f). Pacific World is located near the 1500 block of West Pacific Coast Highway, and South Seas Adult Bookstore is located near the 1500 block of West Pacific Coast Highway.

28. From 1994 to 1996, the Long Beach Police Department made over fifty arrests for lewd conduct at or near the Front Door Theater and Bookstore.

29. Under the provisions of the 1988 adult business ordinance, plaintiffs were required to cease operating their adult businesses no later than August 1, 1990. However, plaintiffs applied for and were granted extensions permitting them to continue as adult entertainment businesses at their existing locations until August 1, 1993.

### E. *Prior Litigation*

30. Because plaintiffs were required to cease operation of their adult businesses at their present locations by August 1, 1993,

they filed a civil rights action on July 30, 1993, in the United States District Court for the Central District of California, entitled *Seung Chun Lim, Fluffy, Inc., a California corporation, and 5436 Santa Monica Boulevard, Inc., v. City of Long Beach,* Civil 93–4530 MRP (Tx).

31. In response to plaintiffs' motion for a preliminary injunction, the City voluntarily refrained from enforcing the 1988 Ordinance pending trial.

32. While the previous lawsuit was pending, the City, in November, 1994, amended the 1988 Ordinance as described above. Thereafter, on November 29, 1994, the district court dismissed the earlier case without prejudice to plaintiffs' rights to challenge the constitutionality of the 1994 Ordinance in a new lawsuit. On April 17, 1996, just thirty-one days before the expiration of the amortization period under the 1994 Ordinance, plaintiffs filed the present action. On May 6, 1996, the City stipulated to the entry of a preliminary injunction. As a result of the preliminary injunction, plaintiffs have continued to operate their adult businesses at their existing locations.

### F. *Potentially Available Alternative Sites*

33. The following commercial and industrial [1] sites, listed by Los Angeles County Assessor's Parcel number, were identified by the City as available for adult entertainment uses within the City of Long Beach.

34. *North Long Beach Area*

a. 7075–1–1. Lot Size: 65± acres. Zoning: Commercial. This lot consists of a small commercial center with seven units. In January, 1997, two units were vacant.

b. 7075–1–918. Lot Size: 65± acres. Zoning: General Industrial.[2] This property

---

1. Under LBMC Title 21 § 21.15.560, " 'commercial' means a category of uses characterized by the exchange of goods and services for financial or other consideration." And under LBMC § 21.15.1460, " 'industrial' means a category of land uses comprised of these activities necessary to convert natural resources into finished products. These activities include all resource extracting, resource processing, manufacturing, assembling, storage, transhipping and wholesaling that precede the arrival of goods at a retail land use." *See* Exhibit 218.

2. Chapter 21.33.020 of the LBMC defines industrial districts as follows: A "Light Industrial"

district "allows a wide range of industries whose primary operations occur entirely within enclosed structures and which pose limited potential for environmental impacts on neighboring uses. While the emphasis is on industrial, manufacturing, and related uses, small-scale office and commercial uses intended to serve nearby industries and employees are permitted." A "Medium Industrial" district "allows a wide range of industries and industrial processes that involve more intensive operations.... [O]ffice and commercial uses intended to serve nearby industries and employees may be permitted." A "General Industrial" district is "considered the City's 'in-

is occupied by a former Navy Hospital. In September 1997, the existing building was being renovated for use as a multi-tenant commercial center. As of September 18, 1997, the building was not available for occupancy.

c. 7113–1–16. Lot Size: 10± acres. Zoning: General Industrial. This property is occupied by a lumber yard and truck storage center.

d. 7113–1–18. Lot Size: 23,050 ± square feet. Zoning: General Industrial. This lot is occupied by an industrial supply business.

e. 7113–1–25. Lot Size: 1.6 acres. Zoning: General Industrial. This property is occupied by an industrial building/commercial enterprise.

f. 7113–2–902. Lot Size: 8.6 acres. Zoning: General Industrial. This property is a vacant lot where certain minerals had previously been extracted from the land. It is located at Cherry Avenue and 69th Street.

g. 7113–13–40. Lot Size: 1.9 acres. Zoning: Medium Industrial. This property is occupied by an industrial building/commercial enterprise.

h. 7115–0–2. Lot Size: 25,000 square feet. Zoning: Commercial. An unoccupied two-story office building is located on this property. The site is located on the north side of Artesia near the 710 freeway.

i. 7115–2–5, 6, 9. Lot Sizes: one at 8,976 Square feet; two at 6,100 square feet. Zoning: Light Industrial. These lots are occupied by three single family residences and a mini-warehouse near Atlantic and 67th Street.

j. 7116–4–19. Lot Size: 2.8 acres. Zoning: General Industrial. This property is occupied by an auto wrecking center.

k. 7116–4–20. Lot Size: 7.4 acres. Zoning: General Industrial. This property is occupied by a vacant industrial warehouse.

l. 7119–18–20, 21. Lot Size: 4.7 acres. Zoning: Commercial. This site was formerly occupied by Builders Emporium Center. In September 1997, the building was vacant and for lease. A small, separate commercial structure is also located on this site. In September 1997, one of the units in the smaller commercial structure was vacant.

m. 7119–19–11. Lot Size: 1.2 acres. Zoning: Commercial. This site is occupied by a propane sales business.

n. 7119–19–12. Lot Size: 16,000 square feet. Zoning: Commercial. This site is occupied by an auto body repair and painting business.

o. 7119–19–13. Lot Size: 12,000 square feet. Zoning: Commercial. This site is occupied by a jeep repair/parts business.

p. 7119–20–1, 2, 3, 5, 6, 7. Lot Size: 42,-105 square feet. Zoning: Commercial. This site is occupied by a multi-tenant commercial/retail center. The center consists of nine units and a freestanding fast-food restaurant. In September 1997, several of the units were vacant and for lease.

q. 7119–20–15. Lot Size: 5,125 square feet: Zoning: Medium Industrial. This site is occupied by an auto repair facility at the northwest corner of East Artesia Boulevard and Schilling Avenue.

r. 7119–20–19. Lot Size: 4,950 square feet. Zoning: Medium Industrial. This site is occupied by a veterinary clinic.

s. 7119–20–26. Lot Size: 13,800 square feet. Zoning: Medium Industrial. A commercial building/auto parts and tire business is located on this site.

t. 7119–20–27. Lot Size: 4,600 square feet. Zoning: Medium Industrial. This site is a vacant lot on the north side of East Artesia Boulevard between Sarina and Minnesota Avenues.

u. 7119–20–28. Lot Size: 20,000+ square feet. Zoning: Medium Industrial. The site is occupied by a dry cleaning and laundry equipment facility.

v. 7119–20–31. Lot Size: 19,500 square feet. Zoning: Medium Industrial. This site is a vacant lot on the north side of East Artesia Boulevard between Schilling and Minnesota Avenues.

dustrial sanctuary' district where a wide range of industries that may not be desirable in other districts may locate. The emphasis is on traditionally heavy and industrial and manufacturing uses." Exh. 218, at Z–172–173.

w. 7119–21–1, 2. Lot Size: 1.7 acres. Zoning: Medium Industrial. This site is occupied by an industrial valve and supply facility.

x. 7119–21–3. Lot Size: 19,525 square feet. Zoning: General Industrial. This site, which is located on the north side of East Artesia Boulevard and east of the L.A. & S.L. rail line, is occupied by a vacant commercial building.

y. 7119–21–4. Lot Size: 19,525 square feet. Zoning: General Industrial. This site consists of an occupied commercial/industrial building.

z. 7119–21–5. Lot Size: 19,525 square feet. Zoning: General Industrial. A commercial building occupied by an auto/truck towing service is located on this site.

aa. 7119–21–9. Lot Size: 18,925 square feet. Zoning: General Industrial. This site is occupied by a laundry and dry cleaning equipment facility. The site is located on the north side of East Artesia Boulevard west of Paramount Boulevard.

ab. 7119–21–10, 11, 12, 13. Lot Size: 53,-625 square feet. Zoning: General Industrial. This site contains a scrap metal and storage yard.

ac. 7119–21–15. Lot Size: 8,415 square feet. Zoning: General Industrial. This site is occupied by a stucco construction business. An industrial building and storage yard are located on this site.

ad. 7119–21–16. Lot Size: Unknown. Zoning: General Industrial. This site is utilized as a scrap metal yard.

ae. 7121–9–1. Lot Size: 16,000 square feet. Zoning: Light Industrial. This site is occupied by a machine tool shop.

af. 7121–9–40. Lot Size: 23,563 square feet. Zoning: Light Industrial. A two story multi-tenant commercial and office building is located on this site. In September 1997, several units were Vacant.

ag. 7121–9–43. Lot Size: 23,200 square feet. Zoning: Light Industrial. A two story multi-tenant office building is located on this site. Part of the building is occupied by a construction firm.

ah. 7121–10–36. Lot Size: 30,516 square feet. Zoning: Light Industrial. This site contains a multi-tenant commercial structure with auto repair facilities. In January 1997, at least one unit was vacant.

ai. 7121–11–2. Lot Size: 18,000 square feet. Zoning: General Industrial. A single-story light industrial building is located at this site. The building is occupied.

aj. 7121–11–12. Lot Size: 5.91 acres. Zoning: General Industrial. This site contains a warehouse that is occupied by a building materials and construction hardware business.

ak. 7121–11–15. Lot Size: 4.8 acres. Zoning: General Industrial. In September 1997, this site was under construction as the future home of U.S. Rentals.

al. 7121–11–21. Lot Size: 32,430 square feet. Zoning: General Industrial. This site contains an industrial/office building. It is occupied by a printing business.

am. 7121–11–32. Lot Size: 32,430 square feet. Zoning: General Industrial. This site consists of an occupied industrial/office building.

an. 7121–11–33. Lot Size: 7 acres. Zoning: General Industrial. The site is occupied by a U–Haul facility and yard.

ao. 7157–13–12. Lot Size: 16,800 square feet. Zoning: Light Industrial. This site is occupied by an auto repair facility.

ap. 7157–13–13. Lot Size: 18,480 square feet. Zoning: Light Industrial. The site is occupied by an auto repair facility.

aq. 7306–22–49. Lot Size: 7.9 acres. Zoning: General Industrial. This site consists of an occupied industrial building.

ar. 7306–22–900. Lot Size: 5.2 acres. Zoning: General Industrial. The site is used as a parking lot for the industrial building located on Assessor parcel number 7306–22–900.

as. 7306–22–904. Lot Size: 8± acres. Zoning: General Industrial. The site consists of an occupied industrial building with adjacent parking lot.

35. *Airport Area*

a. 7148–20–9. Lot Size: 78,300 square feet. Zoning: General Industrial. This site consists of an office and industrial buildings. The buildings are occupied.

b. 7148–20–10. Lot Size: 78,300 square feet. Zoning: General Industrial. This site consists of an unoccupied industrial building.

c. 7148–20–11. Lot Size: 3.2 acres. Zoning: General Industrial. This site consists of several occupied industrial buildings on Cherry Avenue near 33rd Street.

d. 7148–20–12. Lot Size: 3.2 acres. Zoning: General Industrial. This site consists of an occupied industrial building with a materials processing yard.

e. 7149–9–2, 3. Lot Size: 10,000 square feet. Zoning: General Industrial. An auto repair/accessories business is located at this site.

f. 7149–9–4, 5. Lot Size: Unknown. Zoning: General Industrial. This site consists of a welding equipment shop.

g. 7149–9–6. Lot Size: 4,100± square feet. Zoning: General Industrial. This site consists of a two unit office building. The upper unit was vacant in September 1997.

h. 7149–9–6 & 7. Lot Size: 33,000 square feet. Zoning: General Industrial. This site consists of a multi-tenant office building. In September 1997, at least one unit was vacant.

i. 7149–10–1. Lot Size: 1.46 acres. Zoning: General Industrial. This site is occupied by a gas station equipment rental business.

j. 7149–10–2. Lot Size: 1.4 acres. Zoning: General Industrial. This site consists of two occupied commercial buildings.

k. 7149–13–908. Lot Size: Unavailable. Zoning: PD–9. This site consists of a multi-tenant office building. This property is located in a planned development zoning area designated PD–9. This planned zoning area contemplates a business park with professional offices and related services. Mini-theaters and arcades are precluded by Ordinance C–5762 adopted September 15, 1981.

l. 7149–13–911. Lot Size: Unavailable. Zoning: PD–9. This site consists of a multi-tenant office complex. It is located in a planned development zoning area designated PD–9. The development area contemplates professional businesses with related services. Mini-theaters and arcades are precluded by Ordinance No. C–5762, adopted September 15, 1981.

m. 7149–13–919. Lot Size: Unavailable. Zoning: PD–9. This site consists of a multi-tenant office complex. It is located in a planned development zoning area designated PD–9. The development area contemplates professional businesses with related services. Mini-theaters and arcades are precluded by Ordinance No. C–5762, adopted September 15, 1981.

n. 7149–13–921. Lot Size: Unavailable. Zoning: PD–9. This site consists of a multi-tenant office complex. It is located in a planned development zoning area designated PD–9. The development area contemplates professional businesses with related services. Mini-theaters and arcades are precluded by Ordinance No. C–5762, adopted September 15, 1981.

o. 7149–13–922. Lot Size: Unavailable. Zoning: PD–9. This site consists of a multi-tenant office complex. It is located in a planned development zoning area designated PD–9. The development area contemplates professional businesses with related services. Mini-theaters and arcades are precluded by Ordinance No. C–5762, adopted September 15, 1981.

p. 7149–13–924. Lot Size: Unavailable. Zoning: PD–9. This site consists of a multi-tenant office complex. It is located in a planned development zoning area designated PD–9. The development area contemplates professional businesses with related services. Mini-theaters and arcades are precluded by Ordinance No. C–5762, adopted September 15, 1981.

q. 7149–13–927. Lot Size: Unavailable. Zoning: PD–9. This site consists of a multi-tenant office complex. It is located in a planned development zoning area designated PD–9. The development area contemplates professional businesses with related services. Mini-theaters and arcades are precluded by Ordinance No. C–5762, adopted September 15, 1981.

r. 7149–13–928. Lot Size: Unavailable. Zoning: PD–9. This site consists of a multi-tenant office complex. It is located in a planned development zoning area designated PD–9. The development area contemplates professional businesses with related services.

Mini-theaters and arcades are precluded by Ordinance No. C–5762, adopted September 15, 1981.

s. 7149–14–917. Lot Size: 3 acres. Zoning: PD–18. This property is occupied by a multi-tenant office building. It is a planned business development area designated PD–18. The development contemplates business offices and ancillary services. Ordinance C–6223, adopted January 7, 1986 and revised by Ordinance number C–6783, prohibit theaters and arcades in the development area.

t. 7149–14–928. Lot Size: 4.3 acres. Zoning: PD–18. This lot consists of a recreational vehicle storage/parking area with related storage and office facilities.

u. 7212–2–8. Lot Size: 22,400 square feet. Zoning: Medium Industrial. This site is occupied by a pump supply and service business.

v. 7212–2–9. Lot Size: 20,250 square feet. Zoning: Medium Industrial. This lot consists of an open storage area and industrial building adjacent to the pump supply business.

w. 7212–2–12. Lot Size: 16,800 square feet. Zoning: Medium Industrial. This is a vacant lot used for open storage of pipes.

x. 7212–2–13. Lot Size: 14,000 square feet. Zoning: Medium Industrial. This lot is vacant and is used for storage of pipes.

y. 7212–2–22. Lot Size: 32,000 square feet. Zoning: Medium Industrial. This lot is occupied by a used car dealer. It consists of an open parking area with related office facilities.

z. 7212–2–23. This lot is located in the City of Signal Hill.[3]

aa. 7212–2–26. Lot Size: 5.9 acres. Zoning: Medium Industrial. This lot is used for outdoor auto/truck parking.

ab. 7212–3–7. Lot Size: 3.9 acres. Zoning: Medium Industrial. This site consists of two industrial buildings, both of which are occupied.

ac. 7212–3–12. Lot Size: 14,000 ± square feet. Zoning: Medium Industrial. This lot consists of an industrial building. In September 1997, it was available for lease/sale. *See* Exhibit 74.

ac. 7212–3–19. Lot Size: 17,800 square feet. Zoning: Medium Industrial. This lot is occupied by an auto sales business with related office facilities.

ad. 7212–4–11. Lot Size: 17,860 square feet. Zoning: Light Industrial. This lot is occupied by an auto parts retail business.

ae. 7212–4–12. Lot Size: 19,166 square feet. Zoning: Light Industrial. This lot is occupied by a printing company.

af. 7212–4–14. Lot Size: 13,506 square feet. Zoning: Light Industrial. This is a vacant lot used as a truck parking lot.

ah. 7212–4–17. Lot Size: 1.5 acres. Zoning: Light Industrial. A Charlie Brown's Restaurant is located on this site.

ai. 7212–9–911. Lot Size: 91 acres. Zoning: Light Industrial. This is undeveloped land that is currently used as a recycling center and public dump. According to the City, part of this site was an oil producing field. Plaintiff's Exhibit 181A indicates that the site is not readily accessible to retail customers and lacks appropriate infrastructure.

36. *Hughes Aircraft Area*

a. 7310–16–61. Lot Size: 1.3 acres. Zoning: Medium Industrial. This parcel consists of a vacant lot that is used for shipping container storage. In January 1997, the property was for sale.

37. *Traffic Circle*

a. 7219–9–3. Lot Size: 15,250 Square feet. Zoning: Commercial. This lot contains a four-unit commercial center. All of the units were occupied in September 1997.

38. *Seaport Village Area*

a. 7237–20–24. Lot Size: 16,000 ± square feet. Zoning: PD–1. This lot is occupied by a restaurant. The property is part of planned development and improvement area designated PD–1.

b. 7237–20–25. Lot Size: Unavailable. Zoning: PD–1. A multi-tenant, two-story of-

---

**3.** After the Court submitted this matter, the City withdrew this site as a proposed alternative location.

fice building is located on this site. This lot is part of a planned business development area designated PD–1, Area 25.

c. 7237–20–26. Lot Size: 21.12 acres. Zoning: PD–1. A multi-tenant regional commercial center is located on this lot. This lot is part of a planned development and improvement area designated PD–1, Area 18. In January 1997, fourteen retail units and two restaurant units were vacant.

d. 7237–20–40. Lot Size: Unavailable. Zoning: PD–1. A planned multi-tenant business/commercial development is located on this site. This site is also part of a planned development and improvement area designated PD–1, Area 25.

e. 7237–20–41. Lot Size: Unavailable. Zoning: PD–1. A planned multi-tenant business/commercial development is located on this site. This site is part of a planned development and improvement area designated PD–1, Area 25.

f. 7237–20–43. Lot Size: 4.25 acres. Zoning: PD–1. This is an undeveloped parcel of land that is part of a planned development and improvement area designated PD–1, Area 25.

g. 7237–20–44. Lot Size: ±3 acres. Zoning: PD–1. This is an undeveloped parcel of land that is part of a planned development and improvement area designated PD–1, Area 25.

h. 7237–20–45. Lot Size: included as part of preceding lot. Zoning: PD–1. This is an undeveloped parcel of land that is part of a planned development and improvement area designated PD–1, Area 25.

i. 7242–11–9. Lot Size: 2.2 acres. Zoning: PD–1. This lot consists of unimproved land. This lot is part of a planned development and improvement area designated PD–1, Area 29.

j. 7242–11–10. Lot Size: 16,000 square feet. Zoning: PD–1. This lot consists of unimproved land. This lot is part of a planned development and improvement area designated PD–1, Area 29.

k. 7242–11–11. Lot Size: 1.5 acres. Zoning: PD–1. This lot consists of unimproved land. This lot is part of a planned development and improvement area designated PD–1, Area 29.

l. 7242–12–6. Lot Size: 2.4 acres. Zoning: PD–1. A multi-tenant office building is located on this lot. This lot is part of a planned development and improvement area designated PD–1, Area 29.

39. *Port Area*

a. 7429–7–18. Lot Size: 2.9 acres. Zoning: General Industrial. This parcel is used for container pallete storage.

b. 7429–17–6. Lot Size: 10,000 square feet. Zoning: General Industrial. This lot is occupied by a welding and radiator repair shop.

c. 7429–17–905. Lot Size: 6,534 square feet. Zoning: General Industrial. This lot consists of vacant land.

d. 7429–17–910. Lot Size: 6,000 square feet. Zoning: General Industrial. This lot consists of vacant land.

e. 7429–41–37. Lot Size: 7,140 square feet. Zoning: General Industrial. An industrial building with outdoor storage is located on this property. The building is occupied.

f. 7429–41–46. Lot Size: 27,400 square feet. Zoning: General Industrial. An industrial building with outdoor storage is located on this lot. The building is occupied by an electric motor company.

g. 7432–3–16. Lot Size: 6,000 square feet. Zoning: General Industrial. A radiator repair shop is located on this site.

h. 7432–3–17. Lot Size: 12,000 square feet. Zoning: General Industrial. This lot is occupied by a restaurant.

i. 7432–3–18. Lot Size: 6,100 square feet. Zoning: General Industrial. A welding shop is located on this lot.

j. 7432–3–29. Lot Size: 10,700 square feet. Zoning: General Industrial. An industrial supply company is located at this site.

k. 7432–4–23. Lot Size: 11,160 square feet. Zoning: General Industrial. This site is occupied by a restaurant.

l. 7432–10–18. Lot Size: 5,040 square feet. Zoning: General Industrial. This lot is used for general industrial storage.

m. 7432–10–19. Lot Size: 10,080 square feet. Zoning: General Industrial. This site is occupied by a welding supply company.

n. 7432–10–20. Lot Size: 5040 square feet. Zoning: General Industrial. This site is used for parking for the office building.

o. 7432–10–21, 22, 23. Lot Size: 12,000 square feet. Zoning: General Industrial. An office building is located on this site.

p. 7432–10–24. Lot Size: 10,160 square feet. Zoning: General Industrial. The site is occupied by an auto/truck supply business.

q. 7432–19–23, 24, 25, 26. Lot Size: 50,-000 square feet. Zoning: General Industrial. This site is occupied by a transport company with related open storage.

40. The City identified the following additional lots as potential sites for adult entertainment uses:

a. 7113–2–4. Lot Size: 17.8 acres. Zoning: General Industrial. This site is occupied by a Food 4–Less market and Home Base Center with related parking. Part of this site is located within a residential buffer zone. According to the City, it would be possible to subdivide the lot so that part of the lot would be outside the residential buffer zone.

b. 7119–18–27. Lot Size: 7+ acres. Zoning: Commercial. This site is a commercial center with a Food 4–Less market and related parking. Part of this site is located within a church buffer zone. According to the City, this lot could be subdivided so that part of the site would be outside the restricted buffer zone and would then be available for adult entertainment uses.

c. 7242–900. Lot Size: Unavailable. Zoning: PD–4, Area 2. This site consists of Marine Stadium and adjacent property. The City does not suggest that Marine Stadium is available for adult entertainment uses. However, the City suggests the property south of Second Street on Marina Drive could be subdivided so that several parcels would be outside a residential buffer zone. These new subdivided sites would then be available for adult entertainment.

d. The commercial center adjacent to the Queen Mary tourist center. The leases for this commercial center exclude adult entertainment businesses.

41. Excluding the sites withdrawn by the City, the City has identified 115 potentially available alternative sites for adult entertainment establishments. With the exception of the ninety-one acre industrial site described in paragraph 35(ai), all the other industrial sites are accessible to the public and, as depicted in the photographic exhibits, have access to necessary utilities and other municipal services. The vacant lot previously used for mineral extraction described in paragraph 34(f) and the industrial site occupied by an auto wrecking center and junk yard described in paragraph 34(j) are excluded from the business real estate market under *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1532 (9th Cir.1993) (junk yards, steel yards, and car storage lots properly excluded under *Renton v. Playtime Theatres*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).

42. The 115 locations do not constitute the total market for alternative sites that potentially could be used for adult business establishments. The City did not attempt to identify every possible alternative location due to the cost of such a survey. The 115 sites identified by the City represent an attempt by the City to show the existence of sufficient alternative locations available to the plaintiffs and other adult businesses.

43. Plaintiffs concede that eight sites are available for plaintiffs to relocate, and seven of these sites are more than 1,000 feet from each other. These sites are described in paragraph 34(a), parcel # 7075–1–1 (Exhibit 1); paragraph 34(l), parcel # 7116–18–20, 21 (Exhibit 12); paragraph 34(p), parcel # 7119–20–31 (Exhibit 22); paragraph 34(x), parcel # 7119–21–3 (Exhibit 24); paragraph 34(af), parcel # 7121–9–40 (Exhibit 32); paragraph 35(h), parcel # 7149–9–6 & 7 (Exhibit 53); paragraph 38(c), parcel # 7237–20–26 (Exhibit 86).

44. At least twenty-seven or twenty-eight[4] adult businesses could co-exist under

---

**4.** Whether the minimum number is twenty-seven or twenty-eight is unclear because the vacant lot previously used for mineral extraction located at Cherry Avenue and 69th Street described in paragraph 34(f) has been excluded from the business real estate market by the Court. Based upon the evidence submitted, the Court cannot determine whether another site in this general area could replace the excluded site. This poten-

the 1994 Ordinance. *See* Exhibit 160, Overall City Study Areas Depicting Sites City Claims are Available with 1,000 Foot Minimum Distance Between Sites.

45. Seven percent of the Commercial/industrial area of the City of Long Beach is available for adult entertainment businesses.

46. Approximately forty percent of the City of Long Beach is zoned residential, nine percent of the City of Long Beach is zoned commercial, and nineteen percent of the City of Long Beach is zoned industrial.

47. Approximately 396 business licenses are applied for every month, and thirty-six of these (approximately ten percent) are for retail establishments. There are approximately 1271 retail business licenses in the City of Long Beach, and thirty-seven of the retail businesses are bookstores.

48. In addition to the four adult business establishments maintained by plaintiffs, there is a massage parlor that may also be required to relocate. The other known existing adult entertainment business—Angel's Nightclub—is in full compliance with the locational requirements of the 1994 Ordinance.

### III.

### *Conclusions of Law*

**A. *Constitutional Considerations in Limiting the Location of Adult Businesses***

■ The Long Beach Ordinance does not ban adult businesses outright but simply limits the areas of the city in which they may operate. Because zoning laws such as the ordinance at issue target the secondary effects of adult businesses, rather than the content of the speech involved, they are considered content-neutral time, place, and manner restrictions and are constitutionally permissible so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative

avenues of communication. *City of Renton v. Playtime Theatres,* 475 U.S. 41, 46, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). The parties do not dispute that curbing the secondary effects of adult businesses, such as neighborhood deterioration, crime, and decreased property values, is a substantial government interest. Only the second *Renton* factor is at issue in this case: whether the Long Beach ordinance unreasonably limits plaintiffs' alternative avenues of expression. *See* Pretrial Conference Order, ¶ 7(a).

■ Under *Renton,* cities may regulate adult businesses by dispersing them over an extended geographical area. 475 U.S. at 52, 106 S.Ct. 925. However, a local government infringes an adult business's First Amendment rights if it effectively denies the business a "reasonable opportunity to open and operate an adult theater within the city." *Id.* at 54, 106 S.Ct. 925; *see also Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1529 (9th Cir.1993) (quoting *Renton* ); *Walnut Properties, Inc. v. City of Whittier,* 861 F.2d 1102, 1107 (9th Cir.1988) (same).

■ An adult business has a reasonable opportunity to open and relocate if (1) the available sites are part of an actual business real estate market, and (2) after excluding those sites that may not properly be considered to be part of the relevant market, there are an adequate number of potential relocation sites for already existing businesses. *Topanga Press,* 989 F.2d at 1530.

**1. Standard for Defining the Relevant Market**

■ A site is potentially available if (1) it is not unreasonable to believe that it would ever become available to any commercial enterprise, (2) it suits some generic commercial enterprise, although not every particular enterprise,[5] or (3) it is commercially zoned.

---

tial discrepancy is immaterial because even an ordinance that allows only twenty-seven adult businesses to co-exist in the City of Long Beach is constitutionally permissible.

5. In *Topanga Press,* the court excluded sites from the relevant market that were located under the Pacific Ocean; in the Los Angeles Airport or Van Nuys Airport; in areas used as landfill; in areas used by the Port of Los Angeles and/or as oil

refineries; on land occupied by junk yards, steel yards, and car storage lots; and on land used for petroleum gas storage. *Topanga Press,* 989 F.2d at 1532; *see also, Basiardanes v. City of Galveston,* 682 F.2d 1203, 1214 (5th Cir.1982) (concluding that whether defined as physically or economically unsuitable, areas located among warehouses, shipyards, and undeveloped areas did not provide adult businesses with a reasonable opportunity to relocate).

*Topanga Press,* 989 F.2d at 1531. If a site is located in an industrial or manufacturing zone, it must also be reasonably accessible to the general public and have a proper infra- structure including sidewalks, roads, and lighting. *Id.*

Plaintiffs argue strenuously that occupied properties may not be included in the rele- vant market, yet they cite no authority for this proposition. In *Renton,* respondents as- serted that some of the land in question "is already occupied by existing businesses, that 'practically none' of the undeveloped land is currently for sale or lease, and that in gener- al there are no 'commercially viable' adult theater sites within the 520 acres left open by the Renton ordinance." 475 U.S. at 53, 106 S.Ct. 925. The Supreme Court explained that the Ninth Circuit had erred in accepting plaintiffs' argument that permissible loca- tions were unavailable:

> That respondents must fend for them- selves in the real estate market, on an equal footing with other prospective pur- chasers and lessees, does not give rise to a First Amendment violation..., [W]e have never suggested that the First Amend- ment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices.

*Id.* at 54, 106 S.Ct. 925.

Following *Renton,* the Fifth Circuit found it "patently irrelevant" that certain sites were unavailable either because the owner of the site would not rent or sell to an adult business or because the site was currently occupied. *Woodall v. City of El Paso,* 49 F.3d 1120, 1125–26 (5th Cir.1995). The *Woo- dall* court concluded that neither of these factors was "of any obvious concern under Renton." *Id.* Likewise, in discussing the "ground rules" for determining whether ade- quate alternative sites exist for adult busi- nesses, Judge Collins of this District deter- mined that it was "not particularly relevant" under *Renton* that almost none of the unde- veloped land was for sale or lease and that commercially viable sites were lacking. *3570 East Foothill Blvd., Inc. v. City of Pasadena,* 912 F.Supp. 1257, 1264 (C.D.Cal.1995), *aff'd* 99 F.3d 1147, 1996 WL 593174 (9th Cir.1996) ("*3570 East Foothill I* ").

■ Even properties with a restrictive lease banning adult businesses are consid- ered "potentially available" because the Su- preme Court has declined to carve out spe- cial rules for adult businesses competing in the real estate market. *See Renton,* 475 U.S. at 53, 106 S.Ct. 925; *Topanga Press,* 989 F.2d at 1531, 1532 ("The issue is whether any site is part of an actual market for commer- cial enterprises generally.... The City is correct that at times Mr. Bailey improperly considered factors such as ... whether adult businesses would not be welcomed by land- lords.").

### a. Burden of Proof

Preliminarily, we dispose of the plaintiffs' argument that the City bears the ultimate burden of proof to show that there are a reasonable number of alternative sites poten- tially available to plaintiffs under the terms of the 1994 Ordinance. Plaintiffs contend that not only must the City come forward with specific alternative sites, but the City must also show that such sites are truly available to plaintiffs by showing that each site is neither occupied nor encumbered by a long-term lease or other similar encum- brance. The Court disagrees.

■ Defendant has come forward with a significant number of alternative sites but plaintiffs find them to be unsatisfactory, pri- marily because most of the properties are occupied. Plaintiffs bear the ultimate bur- den of proof:

> The Adult Businesses had the burden of proving that the Ordinances denied them a reasonable opportunity to open and oper- ate their businesses by failing to provide reasonable alternative avenues of commu- nication. To meet their burden, the Adult Businesses had to show that the areas left open to them were inadequate to satisfy the demand for adult business locations.

*Woodall,* 49 F.3d at 1125.

Few lower courts have addressed the bur- den of proof issue directly. In *BBI Enter- prises, Inc. v. City of Chicago,* plaintiff BBI had the burden of proving its constitutional challenge. In pointing out that both parties' proofs had deficiencies, the district court

stated "where as here neither side has supplied entirely reliable information, the party having the burden of persuasion—here BBI—must suffer the consequences of such uncertainty." 874 F.Supp. 890, 895 (N.D.Il. 1995). In *T–Marc, Inc. v. Pinellas County,* the Court held that the law does not require defendants to confirm that the sites are economically and logistically viable, except as it relates to the terms of the ordinance. 804 F.Supp. 1500, 1504 (M.D.Fla.1992). The *T–Marc* court determined that the County had met its burden of complying with the ordinance "by presenting evidence that 123 alternative sites complied with the distance restriction in the ordinance." *Id.* (following *SDJ, Inc. v. City of Houston,* 636 F.Supp. at 1359, 1370 (S.D.Tex.1986), *aff'd,* 837 F.2d 1268 (5th Cir.1988)).

Here, the Court need not decide which party had the initial burden of identifying potentially available alternative sites because the City assumed this obligation early in the litigation. The ultimate burden of persuasion, however, falls on the plaintiffs, who initiated this action. Consequently, plaintiffs have the burden of showing that the alternative sites identified by the City are not potentially available for use as a commercial establishment.[6]

### b. Application

Commercially zoned sites are part of the relevant real estate market. *Topanga Press,* 989 F.2d at 1531. There are nine sites specifically zoned for commercial purposes. There are an additional twenty-three sites located in planned development and improvement areas which are intended for commercial purposes. Additionally, the area adjacent to the Queen Mary, as described in paragraph 40(d), is intended for commercial uses. The three commercial sites described in paragraphs 40(a), 40(b) and 40(c), however, must be excluded from the potential market because they are located within a prohibited buffer zone. By the terms of the Ordinance, these sites are unavailable for use as adult businesses. Although locations could possibly be subdivided, that event is far too speculative to support the City's argument that they should be included in the relevant market.

Despite the presence of a restrictive lease provision prohibiting an adult business establishment in the commercial center adjacent to the Queen Mary, the sites located in that center are properly included in the potential market. As noted above, under *Renton* and *Topanga Press,* properties with restrictive lease provisions are, nonetheless, part of the relevant business real estate market.

Sites in industrial zones are part of the relevant market if three criteria are met: (1) the site is reasonably accessible to the public; (2) the site contains proper infrastructure; and (3) the site suits some generic commercial enterprise, but not any specific one. *Id.*

Here, the majority of the industrial zoned sites—with the exception of the ninety-one acre site described in paragraph 35(ai), the vacant lot previously used for mineral extraction described in paragraph 34(f), and the industrial site occupied by an auto wrecking center and junk yard described in paragraph 34(j)—are potentially available for use as an adult business. With respect to the ninety-one acre site, the evidence does not establish that it is reasonably accessible to the public or that it contains a proper infrastructure to support commercial development. The vacant lot once used for mineral extraction and the site used as an auto wrecking center are analogous to the junk yards and steel yards excluded in *Topanga Press.* The remaining industrial sites satisfy the criteria established by *Topanga Press.*

In sum, after evaluating each site identified by the City under the tests established by *Renton* and *Topanga Press,* there are at least 109 alternative locations potentially available for use as an adult business. Moreover, the evidence established that at least twenty-seven adult entertainment business

---

6. During closing arguments, plaintiffs argued that the burden of proof rested with the City. If the Court were to conclude otherwise, plaintiffs requested that the Court vacate the submission and allow them to supplement the record with additional evidence regarding such matters as whether any site is owner-occupied, the length of any lease and the current availability of the sites identified by the City. The Court denies plaintiffs' request because such evidence would be immaterial under *Renton* and *Topanga Press.*

could co-exist when the 1,000 foot buffer between adult businesses is taken into account.

### 2. Determining Whether the Number of Relocation Sites is Constitutionally Adequate

#### a. A Reasonableness Standard Applies

Once areas not part of the relevant market are excluded, the Court must then determine whether the remaining sites provide adult businesses forced to move with a reasonable opportunity to relocate. *Topanga Press*, 989 F.2d at 1533. There are no bright line rules defining when a given number of relocation sites is constitutionally adequate. Factors that courts have used to assess reasonableness include: (1) the percentage of land potentially available to adult businesses; (2) the number of sites available in relation to the city's population; (3) the number of sites compared with the existing number of adult businesses; and (4) the number of businesses desiring to offer adult entertainment. *3570 East Foothill I*, 912 F.Supp. at 1265. Given the distance requirements of the Long Beach ordinance, the more relevant inquiry is the number of adult businesses that can co-exist simultaneously. *See id.*

Whether the number of relocation sites comports with the First Amendment is a highly fact-specific inquiry, and no constitutional minimum has been established. For example, in *Topanga Press*, the Ninth Circuit affirmed the district court's finding that Los Angeles' 102 adult businesses did not have adequate alternatives for expression because there did not appear to be enough relocation sites to accommodate a reasonable number of the adult businesses. 989 F.2d at 1533 (120 sites). In a later case in the Central District, *Young v. City of Simi Valley*, Judge Rea found that four potential relocation sites did not amount to a reasonable number of alternative means of communication. 977 F.Supp. 1017, 1022 (C.D.Cal.1997). In *3570 East Foothill Blvd., Inc. v. City of Pasadena* ("*3570 East Foothill II*"), Judge Collins concluded that an ordinance limiting adult businesses to eleven relocation sites was constitutionally adequate given that there was only one adult business located in Pasadena. 980 F.Supp. 329, 343 (C.D.Cal.1997).

Courts in other circuits have reached varied results. *See, e.g., Woodall*, 49 F.3d at 1127 (where more "reasonable" sites were available than businesses with demands for them, limitations found constitutionally adequate); *Lakeland Lounge of Jackson, Inc. v. City of Jackson, Miss.*, 973 F.2d 1255, 1260 (5th Cir.1992) (where there were more sites available than adult businesses needing to relocate, "as a matter of arithmetic" the number was reasonable); *International Eateries of America v. Broward County, Florida*, 941 F.2d 1157, 1165 (11th Cir.1991) (twenty-six sites available to an adult entertainment establishment complied with *Renton*); *Alexander v. City of Minneapolis*, 698 F.2d 936, 938–39 (8th Cir.1983) (ordinance unconstitutional because it permitted only twelve relocation sites for thirty businesses); *CLR Corp. v. Henline*, 702 F.2d 637, 639 (6th Cir.1983) (ordinance that permitted only two to four restricted uses in a half-mile strip of the city invalid); *Lady J. Lingerie v. Jacksonville*, 973 F.Supp. 1428, 1437 (M.D.Fla. 1997) (ninety-five sites provided reasonable avenues of alternative communication as a matter of law); *T–Marc*, 804 F.Supp. at 1504 (123 available sites more than adequate).

#### b. Application

As noted above, there are 109 commercial and industrial locations potentially available for use as adult businesses and twenty-seven adult business establishments could co-exist under the provision of the 1994 Ordinance.

The fact that some of the 109 sites are occupied and unavailable or economically unfeasible is immaterial. Defendant is not required to guarantee plaintiffs sites at economical rates. *Renton*, 475 U.S. at 54, 106 S.Ct. 925. "While the County must provide reasonably adequate alternative locations, the County is not required to guarantee plaintiffs a profit at the expense of public interest." *Function Junction, Inc. v. City of Daytona Beach*, 705 F.Supp. 544, 552 (M.D.Fla.1987).

The four adult businesses maintained by plaintiffs must relocate under the 1994 Ordinance. The evidence also suggests that there is one additional adult business—a massage parlor—that also must relocate.

The only other adult business—Angel's Night Club—fully complies with the 1994 Ordinance locational requirements. Thus, at most, five adult businesses must relocate within the City.

The number of alternative sites is significantly larger than in those cases in which the ordinances were struck down. The potential market is more than adequate for four to five adult businesses. The fact that twenty-seven adult businesses could co-exist further supports the Court's conclusion.

### 3. Amortization Period

The ordinance in question was adopted in 1988 with a compliance date for non-conforming uses set for August 1, 1990. Plaintiffs were able to extend this date until August 1, 1993. The 1994 Ordinance provided for an additional eighteen month amortization period ending May 18, 1996.

■ An amortization period must be reasonably measured by the burden on existing businesses. *Ebel v. City of Corona,* 767 F.2d 635, 639 (9th Cir.1985) (*Ebel II* ); *see also T–Marc,* 804 F.Supp. at 1504; *SDJ, Inc.,* 636 F.Supp. at 1371. In striking down an amortization period of sixty days in *Ebel II,* the Ninth Circuit looked to the factors considered by the Washington Supreme Court in an earlier case: the specific circumstances of the non-conforming business, its lease obligation and the ease by which it could convert to a non-adult business. *Ebel II,* 767 F.2d at 639 (following *Northend Cinema, Inc. v. City of Seattle,* 90 Wash.2d 709, 585 P.2d 1153, 1159–60 (1978) (three month amortization period held reasonable)).

Although plaintiffs argue that the eighteen month amortization period is unreasonable, they make no showing as to the terms of their lease obligation or particular circumstances making it unduly burdensome for them to relocate within eighteen months. In fact, owners Seung Chun Lim and Robert Blake made little effort to find alternative sites for their businesses. Larry Spahr found one location, but it was too expensive. Plaintiffs were on notice as early as 1988 that they would have to move, yet they did nothing.

■ Other courts have upheld amortization periods of less than eighteen months.

*See Hart Book Stores, Inc. v. Edmisten,* 612 F.2d 821, 830 (4th Cir.1979) (six month amortization period approved for existing establishments); *T–Marc,* 804 F.Supp. at 1505 (one year amortization period upheld); *SDJ, Inc.,* 636 F.Supp. at 1371 (six month amortization period upheld). Given the circumstances, the eighteen month amortization period was reasonable.

### B. *Plaintiffs' Equal Protection Claim*

Plaintiffs allege that the City's practice of forcing existing adult businesses to relocate while allowing non-conforming non-adult businesses to remain indefinitely singles out adult businesses for unfavorable treatment in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution.

■ The Equal Protection Clause protects against arbitrary classifications of laws and regulations and requires that similarly situated persons be treated equally. *See* U.S. Const. Amend. XIV; *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Although the Equal Protection Clause protects against unreasonable classifications, a plurality of the Supreme Court stated in *Young v. American Mini Theatres* that society's interest in protecting communication in the area of adult entertainment was less important than the interest in unfettered political debate and that the city's interest in curbing the secondary effects and preserving the character of the neighborhood supported the classification. 427 U.S. 50, 70–72, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

Moreover, the two types of non-conforming uses are not similarly situated. Two of plaintiffs' businesses are located on Pacific Coast Highway between Hayes and Termino Avenues, where prostitution and lewd behavior are a problem. Another of plaintiffs' businesses on Atlantic Boulevard was the site of over fifty arrests for lewd conduct from January 1994 to December 1996, as Mr. Spahr acknowledged during the trial. The unequal treatment of non-conforming adult businesses in Long Beach is based on the deleterious effects they have on the surrounding

environment. *See Young,* 427 U.S. at 82 n. 6, 96 S.Ct. 2440.

 The Court's conclusion that the statute does not violate plaintiffs' right to the equal protection of the law is based on largely the same rationale as that leading the Court to find no First Amendment violation. Because the ordinance targets the secondary effects of adult businesses and not the content of protected speech, strict scrutiny is not triggered under the First Amendment. Instead, the rational relationship test applies. Where a fundamental right is not implicated, a classification created by a zoning law is subject to minimal scrutiny. *See e.g., Village of Belle Terre v. Boraas,* 416 U.S. 1, 8, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) ("We deal with economic and social legislation where legislatures have historically drawn lines which we respect against the charge of violation of the Equal Protection Clause if the law be 'reasonable, not arbitrary' ... and bears 'a rational relationship to a (permissible) state objective.'").

 There is no evidence of any intent to discriminate on the content of plaintiffs' speech. Thus, the ordinance passes muster if the City has a rational basis for treating adult uses differently than other non-conforming uses. *See, e.g., Schneider v. City of Ramsey,* 800 F.Supp. 815, 823 (D.Minn.1992), *aff'd* 12 F.3d 140 (8th Cir.1993). Because the statute has only an incidental effect on protected expression and the unequal treatment of adult and non-adult establishments does not directly threaten expression, the classification is rationally related to an important state interest—curbing the secondary effects of adult businesses.

## IV.

### CONCLUSION

Because it is designed to serve a substantial government interest and does not unreasonably limit alternative avenues of communication, the 1994 Ordinance, as applied to plaintiffs, does not deprive plaintiffs of their First Amendment rights. The City has proffered 109 sites to which plaintiffs may relocate. Furthermore, because plaintiffs' adult businesses are not similarly situated to other nonconforming businesses, the fact that only adult businesses must relocate does not of-

fend the Equal Protection Clause. The restrictions set forth in the 1994 Ordinance are rationally related to the governmental interest in curbing the secondary effects of adult entertainment businesses. Consequently, the City is entitled to a judgment dismissing this action on the merits and an order vacating the stipulated preliminary injunction. Defendant shall also recover its costs of suit. Judgment shall be entered forthwith.

Because plaintiffs have advised the Court that they intend to appeal any adverse judgment and seek an injunction pending appeal, the Court's preliminary injunction shall remain in effect for twenty days following entry of the judgment so that plaintiffs may seek appropriate relief from the Ninth Circuit.

**IT IS SO ORDERED.**